IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DBSI SIGNATURE PLACE, LLC, an Idaho )
limited liability company, )
 )
  Plaintiff/Counterdefendant, ) Case No. CV 05-051-S-LMB
 )
v. )
 ) ORDER
BL GREENSBORO, L.P., a Texas limited )
partnership, LS NORTHLINE, LLC, a Texas )
limited liability company, and MARK J. )
SULLIVAN, )
 )
  Defendants/Counterclaimants. )
_____)

  Currently pending before the Court are Plaintiff's Motion for Leave to File Third

Amended Complaint Requesting Punitive Damages (Docket No. 56), Plaintiff's Motion to

Compel Responses to Punitive Damages Discovery (Docket No. 66), Defendants' Motion for

Summary Judgment (Docket No. 80), Plaintiff's Motion for Summary Judgment (Docket No.

79), and Plaintiff's Motion to Strike Fifteenth Affirmative Defense and Count Two of

Defendants' Counterclaim (Docket No. 95).  Having carefully reviewed the record, considered

oral arguments, and otherwise being fully advised, the Court enters the following Order.

## I.

## BACKGROUND

  In May of 2004, DBSI Housing, Inc. ("DBSI Housing"), the affiliated predecessor in

interest to Plaintiff/Counterdefendant DBSI Signature Place LLC ("Plaintiff") began negotiating

ORDER - 1

with Defendant/Counterclaimant BL Greensboro, L.P. ("Greensboro") for the purchase of a commercial office complex ("Signature Place") in Greensboro, North Carolina.  *Plaintiff's Statement of Undisputed Material Facts*, ¶¶ 1, 3 (Docket No. 79, Att. 2); *Second Amended Complaint and Demand for Jury Trial*, ¶ 9 (Docket No. 55).  Defendant/Counterclaimant LS Northline, LLC ("Northline") is the sole general partner of Greensboro and Defendant/ Counterclaimant Mark J. Sullivan ("Sullivan") is the vice-president of Northline.  *Second Amended Complaint and Demand for Jury Trial*, ¶¶ 3-4 (Docket No. 55).  In this capacity, Sullivan communicated with various individuals at DBSI Housing to facilitate negotiations for, and the eventual purchase of, Signature Place.

On July 8th and 9th of 2004, the parties consummated negotiations and executed an Earnest Money Contract ("Contract") for the purchase of Signature Place.  *Plaintiff's Statement of Undisputed Material Facts*, ¶ 3 (Docket No. 79, Att. 2); *Graham Affidavit*, Exhibit E (Docket No. 65, Att. 3).  A proposed assumption of leases ("Assumption") was attached to the Contract. *Graham Affidavit*, Exhibit E (Docket No. 65, Att. 3).  At the closing on September 30, 2004 ("Closing"), Douglas L. Swenson, President of DBSI, executed the Assumption, which provided:

> Assignee [DBSI Housing] hereby assumes, and agrees to perform
> all of the obligations of Assignor [Greensboro] under the Leases
> after the date of this Assignment, and assumes and agrees to pay
> any leasing commissions that become payable after the date of this
> Assignment with respect to any of the Leases . . . .

*Id.* at Exhibit F (Docket No. 65, Att. 4); *Plaintiff's Statement of Undisputed Material Facts*, ¶ 5 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts*, ¶ 5 (Docket No. 94).

ORDER - 2

The leases assumed by DBSI at the Closing include one with TRC Staffing Services, Inc. ("TRC"), entered on January 16, 2004. *McMurray Affidavit*, ¶ 2 (Docket No. 56. Att. 5). The TRC lease specifies that the Lessor—Greensboro at the time the lease was executed—"is providing . . . up to $9.00 per rentable square foot for Tenant Improvements ('Tenant Upfit Allowance')." *Plaintiff's Statement of Undisputed Material Facts*, ¶ 26 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts*, ¶ 26 (Docket No. 94). The lease further provides that "[t]he Tenant Upfit Allowance will be paid to Lessee [TRC] upon completion of the Tenant Improvements, issuance of a Certificate of Occupancy for the Premises, and Contractor's Waiver of Lien." *Graham Affidavit*, Exhibit A at Art. XX of Ex. C (Docket No. 65, Att. 1).

The City of Greensboro issued a Certificate of Occupancy for the TRC premises in April of 2004—almost four months before DBSI executed the Assumption. *McMurray Affidavit*, ¶ 3 (Docket No. 56. Att. 5). However, although the construction work was "substantially completed" in April, 2004, the contractor did not execute a lien waiver until January 21, 2005, and TRC did not request payment for the Tenant Upfit Allowance until February 25, 2005. *Graham Summary Judgment Affidavit*, Exs. F, G (Docket No. 80, Att. 7); *Plaintiff's Statement of Undisputed Material Facts*, ¶¶ 27, 30 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts*, ¶¶ 27, 30 (Docket No. 94).

Another lease assumed by DBSI on September 30, 2004, was executed by Greensboro and Greensboro Orthopedic Clinic, P.A. ("GOC") on June 2, 2004. *Graham Affidavit*, Exhibit D at Art. XXI of Ex. C (Docket No. 65, Att. 2). This lease provided that the Lessor—Greensboro at the time—"shall provide $40.00 per rentable square foot for Tenant Improvements ('Tenant

ORDER - 3

Upfit Allowance')," and that the Tenant Upfit Allowance would be paid "upon completion of the Tenant Improvements and issuance of a Certificate of Occupancy for the Premises." *Plaintiff's Statement of Undisputed Material Facts*, ¶ 28 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts*, ¶ 28 (Docket No. 94).  The total allowance for this tenant upfit came to $1,220,712.  *Id.*  The lease specified that the "Lessor shall pay the Tenant Upfit Allowance upon completion of the Tenant Improvements as evidenced by a certificate of occupancy and delivery of a lien waiver signed by any person or entity who performed work or supplied materials for upfit of the Premises." *Graham Affidavit*, Exhibit D at Art. XXI of Ex. C (Docket No. 65, Att. 2).

GOC commenced construction of its tenant improvements in July 2004 and had substantially completed the improvements by the end of November of 2004.  *Plaintiff's Statement of Undisputed Material Facts*, ¶ 29 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts*, ¶ 29 (Docket No. 94).  The City of Greensboro issued a certificate of occupancy in November—*after* the September Closing on the purchase of Greensboro Place and Plaintiff's Assumption of the leases. *McMurray Affidavit*, ¶ 5 (Docket No. 56, Att. 5).  GOC began to occupy the premises in December of 2004.  *Answer to Second Amended Complaint*, p. 12 at ¶ IX (Docket No. 90).

The parties' Contract required Defendants to provide tenant estoppel certificates as a condition of Closing. *Third Burns Affidavit*, Exhibit 4, p. 11 (Docket No. 79, Att. 3).  Defendant Sullivan delivered these certificates to Plaintiff, as required by the Contract.  Despite the fact that GOC was undergoing tenant upfits and TRC had substantially completed its improvements, their estoppel certificates state that "Tenant asserts no claim against Landlord in regard to any

obligation of Landlord relating to the Premises."  *Graham Affidavit*, Exhibits N, O (Docket No.

65, Att. 6).  The TRC certificate additionally states that TRC had paid no amount to Defendants

for prepaid rent.  *Id*. at Exhibit O.

Greensboro obtained GOC as a tenant, in part, through the efforts of Alliance Commercial

Properties ("Alliance Commercial").  Prior to entering a lease with GOC, Greensboro entered

into a Broker Agency and Commission Agreement Lease Transaction ("Commission

Agreement") with Alliance Commercial on February 17, 2004.  *Graham Affidavit*, Exhibit B

(Docket No. 65, Att. 1).  The Commission Agreement provides that the Listing Agency

(Greensboro) "agrees to pay" Alliance Commercial four percent "of the total commission

received by Listing Agency for the transaction, *payable when Listing Agency receives the*

*commission*."  *Id.* (emphasis added); *Plaintiff's Statement of Undisputed Material Facts*, ¶ 10

(Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts*, ¶ 10

(Docket No. 94).  The Commission Agreement later explains that the "Listing Agency's Listing

Agreement specifies the commission is payable as follows":  "One-half commission to be paid

upon Lease Execution; one-half commission to be paid upon occupancy by Tenant."  *Graham*

*Affidavit*, Exhibit B (Docket No. 65, Att. 1).  Although Greensboro never received a commission

for the GOC lease as the "listing agent," it paid the first half of the lease commission to Alliance

after execution of the lease with GOC.  *Plaintiff's Statement of Undisputed Material Facts*, ¶¶

11, 12 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts*, ¶¶

11, 12 (Docket No. 94).

Plaintiff has now paid the Tenant Upfit Allowances to GOC and TRC, but filed the present

action on January 31, 2005, alleging that Defendants breached their contractual obligations and

ORDER - 5

that Defendant Greensboro is the party responsible for paying the upfit allowances.  Plaintiff also

seeks recovery for TRC's prepaid rent.  *Second Amended Complaint*, ¶ 16 (Docket No. 55).

Defendant has counterclaimed for breach of contract, alleging that (1) Plaintiff breached the

Assumption agreement by failing to pay the second half of Alliance Commercial's leasing

commission, and (2) Defendants are entitled to a setoff based on Plaintiff's alleged failure to

reimburse Defendants for a rents or charges collected after Closing, pursuant to section 8.4 of the

Contract.

Plaintiff has alleged both contract and tort claims against Defendants Greensboro and

Northline, but only tort claims—including fraud—against Defendant Sullivan.  *Second Amended*

*Complaint*, (Docket No. 55).  The primary conduct forming the basis for Plaintiff's tort claims

are representations that Defendant Sullivan allegedly made to Eric Gordon of DBSI Housing

sometime between July 28, 2004, and August 2, 2004.  *Gordon Affidavit*, ¶ 4 (Docket No. 56,

Att. 5).  Mr. Gordon avers that he "confirmed by telephone call with Mark Sullivan . . . that

Greensboro was paying all costs associated with the TRC Lease and GOC Lease, as well as the

other leases reflected on the rent roll, which costs include the tenant improvement allowances

owed to TRC and GOC."  *Id.*  Based on this alleged representation, tenant estoppel certificates

from TRC and GOC, and an email from Sullivan stating that GOC was going to spend an

additional $15.00 per square foot for tenant improvements "over our allowance," Plaintiff has

requested that the Court grant leave to amend its Complaint to add a claim for punitive damages.

*See Gordon Affidavit*, ¶ 4-5 & Exhibits A-B (Docket No. 56, Att. 5); *Memorandum in Support of*

*Motion for Leave to File Third Amended Complaint* (Docket No. 56, Att. 1).

Both parties also have moved for summary judgment (Docket Nos. 79 & 80), and Plaintiff has filed a Motion to Strike the Fifteenth Affirmative Defense and Count Two of Defendants' Counterclaim (Docket No. 95).

Plaintiff has consented to the dismissal of its claim for unfair and deceptive acts/practices based on North Carolina law, its claim for negligent representation, and its claim for unjust enrichment. *Plaintiff's Response to Defendants' Motion for Summary Judgment*, p. 6 (Docket No. 93). As a result, Plaintiff's only remaining claims are for (1) breach of contract, (2) fraud, and (3) unfair and deceptive acts/practices under the Idaho Consumer Protection Act. Defendants have moved for summary judgment on all three claims, and Plaintiff has moved for summary judgment on all of its breach of contract claims except the claim based on the duty of good faith and fair dealing. Also at issue are Defendants' counterclaims for breach of contract. Both parties have moved for summary judgment on the counterclaim related to payment for the second half of Alliance Commercial's leasing commission, and Plaintiff has moved to strike the second counterclaim seeking a setoff for amounts collected by Plaintiff after the Closing.[1] The final matter addressed in this Order is whether a claim for punitive damages should be allowed in this action.[2]

---

[1] This counterclaim is not the subject of the pending motions for summary judgment, other than as an asserted defense to Plaintiff's claims for breach of contract. By Order dated April 27, 2006, however, the Court allowed supplemental discovery on this counterclaim and the parties may seek summary judgment on this counterclaim on or before August 1, 2006. *Order* (Docket No. 107).

[2] The Court has held two hearings on the issues raised in this action and the matters have been fully briefed.

ORDER - 7

## II.

## PRELIMINARY MATTERS

A.    <u>Motion to Strike</u>

1.    **Standards of Law**

Federal Rule of Civil Procedure 12(f) provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Rule 12(f) motions are generally viewed with disfavor, *see, e.g., Bassiri v. Xerox Corp.*, 292 F. Supp. 2d 1212, 1220 (C.D. Cal. 2003); *Rosales v. Citibank*, 133 F. Supp. 2d 1177, 1180 (N.D. Cal. 2001), and "should be denied unless it can be shown that no evidence in support of the allegation would be admissible, or those issues could have no possible bearing on the issues in the litigation."  *Gay-Straight Alliance Network v. Visalia Unified School Dist.*, 262 F. Supp. 2d 1088, 1099 (E.D. Cal. 2001).  The Court must "view the pleading under attack in the light most favorable to the pleader."  *Bassiri*, 292 F. Supp. 2d at 1220.

2.    **Discussion**

Plaintiff has moved to strike Defendants' Fifteenth Affirmative Defense and Count Two of their Counterclaim because the defense and counterclaim  were included in an Answer filed by Defendants after the October 17, 2005 deadline for amending pleadings.  *See Order* (Docket No. 51).  On October 14, 2005, Plaintiff filed a Motion for Leave to Amend to File Second Amended Complaint.  (Docket No. 54).  That same day, although the Court had not yet granted Plaintiff's Motion, Plaintiff also filed the Second Amended Complaint.  (Docket No. 55).  Plaintiff's Second Amended Complaint alleged for the first time that Defendants owe Plaintiff $14,175 for the TRC Staffing Tenant Upfit Allowance.  (Docket No. 55).

ORDER - 8

Defendants did not object to Plaintiff's Motion to Amend or otherwise respond to the Second Amended Complaint.  It appears that Defendants' failure to respond was due, in part, to Plaintiff's filing, on October 17, 2005, of a Motion for Leave to File Third Amended Complaint Requesting Punitive Damages.  (Docket No. 56).  Defendants objected to Plaintiff's Motion requesting leave to file a Third Amended Complaint, and the Court held a hearing on January 26, 2006.  At the hearing, the Court deferred ruling on the Motion for Leave to File Third Amended Complaint, but granted the Motion for Leave to File Second Amended Complaint and ordered Defendants to file an answer within twenty days.  Defendants complied with the Court's order and, on February 14, 2006, filed their Answer to Plaintiff's Second Amended Complaint.  (Docket No. 90).  It is this Answer that includes the challenged affirmative defense and counterclaim.

The new affirmative defense and counterclaim are both based on Defendants' assertion that they have a right to a setoff against all of Plaintiff's claims (not just Plaintiff's new claim for the TRC upfit allowance asserted for the first time in the Second Amended Complaint).  *Answer to Second Amended Complaint* (Docket No. 90).  Specifically, Defendants claim that Plaintiff failed to account for or reimburse Defendant Greensboro for amounts owing to Greensboro for the period prior to the Closing Date, as required by Section 8.4(a) of the parties' Contract.[3] *Answer to Second Amended Complaint*, ¶¶ VI, VIII (Docket No. 90).  Defendants seek

---

[3]  Section 8.4(a) of the Contract states that "[a]ny rents or other charges subsequently collected by Purchaser [DBSI Housing, Inc.] which are owing to Seller [Greensboro] by tenants or occupants of the Real Property for periods prior to the Closing Date shall forthwith be paid by Purchaser to Seller, including without limitation base escalation or pass-through collection of operating expense amounts." *Third Burns Affidavit*, Exhibit 4, p.10 (Docket No. 79, Att. 3).

ORDER - 9

recoupment and/or setoff "in an amount to be proven at trial" against the amount requested by

Plaintiff for the breach of contract claims.  *Id*. at ¶ XIII.

      This challenge to Plaintiff's recovery on its contract claims was not included in

Defendants' earlier Answers and Plaintiff asserts that Defendants have not disclosed any

documents or facts supporting their claim to a setoff.[4]  *Memorandum in Support of Motion to*

*Strike*, p. 3. (Docket No. 95, Att. 1).  Plaintiff also claims that it has been prejudiced by the late-

disclosure of the setoff claim because both the discovery and dispositive motion deadlines have

passed and, thus, Plaintiff can no longer conduct discovery of the facts underlying Defendants'

new claims, nor request summary judgment with regard to them.  *Id.*  Plaintiff requests that the

Court grant its Motion to Strike as the only way to avoid manifest prejudice.  *Id*. at p. 4.

      The Court notes, however, that Plaintiff opened the door to the new affirmative defense

and counterclaim by amending its Complaint.  When Plaintiff amended its Complaint a second

time, it added a new claim for breach of contract and a request to recover additional amounts.

"[W]hen a plaintiff files an amended complaint which changes the theory or scope of the case,

the defendant is allowed to plead anew as though it were the original complaint filed by the

Plaintiff."  *Brown v. E.F. Hutton & Co.*, 610 F. Supp. 76, 78 (S.D.Fla. 1985).  Because "the

amending pleader chooses to redo his original work, and receives the benefit of this *nunc pro*

*tunc* treatment, he can hardly be heard to complain that claims filed against him are improper

because they should have been asserted in response to his original pleading."  *Joseph Bancroft &*

*Sons Co. v. M. Lowenstein & Sons, Inc*., 50 F.R.D. 415, 419 (D.Del. 1970).

---

[4]  The sole document in the record before the Court evincing the setoff is an April 2005 demand
letter from Greensboro requesting that Plaintiff pay all post-closing prorations as required by the
Earnest Money Contract.

ORDER - 10

Several courts have applied this rationale to allow a defendant to amend its pleading after a plaintiff files an amended complaint. *See, e.g., Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 2000) (explaining that "[b]ecause a plaintiff's new complaint wipes away prior pleadings, the amended complaint opens the door for defendants to raise new and previously unmentioned affirmative defenses"); *Tralon Corp. v. Cedarapids, Inc*., 966 F. Supp. 812, 832-33 (N.D.Iowa 1997) (providing defendant a "fresh start" in answering plaintiffs' Second Amended Complaint because the Second Amended Complaint "greatly expanded" both the factual allegations made by plaintiffs against defendant as well as the scope of those claims); *Refuse Fuels, Inc. v. Nat'l Union Fire Ins. Co.*, 139 F.R.D. 576, 578 (D.Mass. 1991) (explaining that "defendants did not need leave to serve new counterclaims and assert new defenses" after plaintiffs amended their complaint pursuant to Fed. R. Civ. P. 15(a)).

In conformity with this authority, the Court finds it appropriate to allow Defendants to amend their answer to include the new affirmative defense and counterclaim. Although the Court recognizes that Plaintiff did not significantly expand the scope of its claims, it did add a new claim for breach of contract and a new fact supporting its fraud claim. Even though Defendants' counterclaim and affirmative answer respond to more than just the specific amendments made in Plaintiff's Second Amended Complaint, they also are responsive to Plaintiff's new basis for breach of contract. For all of these reasons, Plaintiff's Motion to Strike will be denied. However, to avoid potential prejudice to Plaintiff because of the expiration of the discovery and pretrial motion deadlines, the Court has granted an extended period of discovery solely related to Defendants' counterclaim and affirmative defense, *Order* (Docket No. 107), and will also allow the parties to file dispositive motions on the setoff claim.

ORDER - 11

**B.**     **Choice of Law**

The parties agree that North Carolina law applies to the parties' breach of contract claims and that Idaho law applies to Plaintiff's fraud and unfair and deceptive acts/practices claims. *Defendants' Memorandum in Support of Motion for Summary Judgment*, pp. 4-6 (Docket No. 80, Att. 1); *Plaintiff's Response to Defendants' Motion for Summary Judgment*, p. 2 (Docket No. 93).  Because there is no dispute, the Court will only briefly discuss the choice of law issues.

First, because the parties' contract contains a choice of law provision selecting North Carolina law to govern and interpret the contract, and because Idaho recognizes choice of law clauses, North Carolina law governs the contract issues in this action.  *See Sword v. Sweet*, 140 Idaho 242, 246, 92 P.3d 492, 496 (2004) (applying the Restatement (Second) of Conflict of Laws and allowing enforcement of choice of law clauses).  Additionally, Idaho applies the most significant relationship test—involving application of a variety of factors—to determine the law applicable to tort claims.  *Grover v. Isom*, 137 Idaho 770, 772-73, 53 P.3d 821, 823-24 (2002). Both parties have acknowledged that these factors weigh in favor of applying Idaho law. *Defendants' Memorandum in Support of Motion for Summary Judgment*, pp. 5-6 (Docket No. 80, Att. 1); *Plaintiff's Response to Defendants' Motion for Summary Judgment*, p. 2 (Docket No. 93).  Accordingly, the Court will apply North Carolina law to the parties' breach of contract claims, and will apply Idaho law to Plaintiff's fraud and unfair and deceptive acts/practices claims.

# III.

# MOTIONS FOR SUMMARY JUDGMENT

## A.    <u>Standards of Law</u>

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Under Rule 56, summary judgment is required if the nonmoving party fails to make a showing sufficient to establish the existence of an element that is essential to the party's case and upon which the party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the nonmoving party fails to make such a showing on any essential element of the party's case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id*. at 323.  *See also* Fed. R. Civ. P. 56(e).[5]

According to Rule 56, an issue must be both "material" and "genuine" to preclude entry of summary judgment.  An issue is "material" if it affects the outcome of the litigation.  An issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute . . . to

---

[5]  Rule 56(e) states that, in responding to a motion for summary judgment,
> an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e).

require a jury or judge to resolve the parties' differing versions of the truth at trial," *Hahn v.*

*Sargent*, 523 F.2d 461, 464 (1st Cir. 1975) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*,

391 U.S. 253, 289 (1968)), or when the "evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Ninth Circuit Court of Appeals cases are in accord. *See, e.g., British Motor Car Distribs.,*

*Ltd. v. S.F. Auto. Indus. Welfare Fund*, 882 F.2d 371 (9th Cir. 1989).

 In ruling on summary judgment motions, the court does not resolve conflicting evidence

with respect to disputed material facts, nor does it make credibility determinations. *T.W. Elec.*

*Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Moreover, all

inferences must be drawn in the light most favorable to the nonmoving party. *Id.* at 631. That is,

"if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary

judgment must be denied." *Id.*

 In order to withstand a motion for summary judgment, a nonmoving party

> (1) must make a showing sufficient to establish a genuine issue of fact with
> respect to any element for which it bears the burden of proof; (2) must
> show that there is an issue that may reasonably be resolved in favor of
> either party; and (3) must come forward with more persuasive evidence
> than would otherwise be necessary when the factual context makes the
> non-moving party's claim implausible.

*British Motor Car Distribs.*, 882 F.2d at 374 (citation omitted). Moreover, where the moving

party meets its initial burden of demonstrating the absence of any genuine issue of material fact,

the nonmoving party must "produce 'specific facts showing that there remains a genuine issue

for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed."

*Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983) (citing *Ruffin v. County of L.A.*, 607

F.2d 1276, 1280 (9th Cir. 1979)).

ORDER - 14

In recent years the Supreme Court, "by clarifying what the non-moving party must do to withstand a motion for summary judgment, has increased the utility of summary judgment." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). Therefore, "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id*. A material fact is

> one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the *substantive law* governing the claim or defense. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

*T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)) (emphasis added).

## B.      Plaintiff's Breach of Contract Claim Based on Section 9.4(e) of the Contract

Plaintiff first claims that Defendants breached section 9.4(e) of the parties' Contract by reporting that no work had been performed for which they had not paid. *Plaintiff's Reply in Support of Motion for Summary Judgment*, p. 6 (Docket No. 98); *see also Second Amended Complaint and Demand for Jury Trial*, ¶¶ 32, 33 (Docket No. 55). Section 9.4(e) of the Contract provides: "Liens. No labor has been performed, nor materials supplied to Seller for the Property which the Seller has not fully paid." *Plaintiff's Statement of Undisputed Material Facts*, ¶ 25 (Docket No. 79, Att. 2). Plaintiff's Second Amended Complaint specifies that its claim for breach of section 9.4(e) is based on its assertion that both GOC and TRC had equitable liens in Signature Place and, therefore, Defendants were required to report that labor had been performed for the Property for which Defendants had not yet paid. Plaintiff argues that equitable liens existed because, at the time the parties entered the Contract, TRC had substantially completed its

improvements and GOC had commenced its improvements.  *Second Amended Complaint and Demand for Jury Trial*, ¶¶ 31-33 (Docket No. 55).

Defendants respond that neither GOC nor TRC had equitable liens in Signature Place and Defendants did not breach their obligation under section 9.4(e).  *Response to DBSI's Motion for Summary Judgment*, p. 10 (Docket No. 91, Att. 1).

An equitable lien arises "[w]here property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched."  *Embree Const. Group, Inc. v. Rafcor, Inc*., 411 S.E.2d 916, 923 (N.C. 1992) (quoting Restatement of Restitution § 161 (1937)).  Defendants agree that there is evidence in the record demonstrating that GOC and TRC made payments to their general contractors for tenant improvements prior to the September 30, 2004 Closing.  *Response to DBSI's Motion for Summary Judgment*, p. 10 (Docket No. 91, Att. 1).  However, they note that under North Carolina law, "equity will not lend its aid in any case where the party seeking it has a full and complete remedy at law."  *Id*. at p. 11 (quoting *Jefferson Standard Life Ins. Co. v. Guilford Cty*., 34 S.E.2d 430, 434 (N.C. 1945)).

Defendants point out that both GOC and TRC could have sued Greensboro for breach of their lease agreements to recover the tenant upfit allowances and could have setoff against rent any amounts owing on the upfit allowances.[6]  Plaintiff counters that these provisions in the leases created an equitable lien against the property in favor of TRC and GOC because it

---

[6]  Section 3.2 of GOC's office lease provides that GOC's "covenants to pay the Base Rent and the Additional Rent are not independent of, and may be offset against, the Lessor's covenants to pay the Tenant Upfit Allowance."  *Graham Affidavit*, Exhibit D (Docket No. 80, Att. 3).  TRC's lease does not contain a similar provision.

ORDER - 16

indicates an intention to make the property a security for Greensboro's obligation to pay the upfit allowances. *Plaintiff's Reply in Support of Motion for Summary Judgment*, p. 7 (Docket No. 98) (citing *Winborne v. Guy*, 22 S.E.2d 220 (N. C. 1945)). However, as explained in another case cited by Plaintiff, the Court's "equitable intervention is obviated when an adequate remedy at law is available to the plaintiff." *Embree*, 411 S.E.2d at 920. Thus, an equitable lien is not enforceable unless and until there is no adequate remedy at law available. *See Potter v. Homestead Pres. Ass'n*, 412 S.E.2d 1, 7 (N.C. 1992) (explaining that "[a] plaintiff must pursue her legal remedies first").

Here, both TRC and GOC had remedies at law available to recover against Greensboro. They could sue for breach of contract based on the lease agreements providing for payment of the agreed tenant upfit allowances. Any claim for unjust enrichment, which is necessary for an equitable lien to arise, would arise only if Greensboro failed to pay for the tenant improvements. *See Restatement of Restitution* § 161 (1937) (explaining that an equitable lien arises if the property owner would be unjustly enriched). Such a failure had not occurred by September 30, 2004 because the conditions stated in the leasing agreements for payment of the upfit allowances (i.e., the certificates of occupancy and waiver of liens) had not yet occurred.

Moreover, some courts have considered completion of the work giving rise to the claimed equitable lien to be a critical factor in creating the lien. *See Embree*, 411 S.E.2d at 922 (collecting cases). The Court is of the opinion that it is a critical aspect of the creation of an equitable lien in favor of GOC here.[7] Accordingly, because the work on the GOC space had not

---

[7] DBSI implicitly acknowledges that its claim for an equitable lien in favor of GOC is tenuous. *See, e.g., Plaintiff's Memorandum in Support of Motion for Summary Judgment*, pp. 8-9 (stating

(continued...)

been completed and the conditions for payment on the TRC and GOC allowances not met as per the terms of the leasing agreements, Plaintiff's claim for summary judgment based on its argument that Defendants created equitable liens in favor of TRC and GOC is denied.

However, Plaintiff argues that, even if no equitable liens were created, Defendant Greensboro breached section 9.4(e) because it had not paid for work on the Property that it was obligated to pay for pursuant to the TRC and GOC leases. *Plaintiff's Memorandum in Support of Motion for Summary Judgment*, p. 10 (Docket No. 79, Att. 10). In other words, because TRC and GOC were responsible for paying their materialmen and contractors for the work on the Property, and because Defendant Greensboro was responsible for reimbursing TRC and GOC for a portion of the work, Greensboro had not fully paid for all work performed and materials supplied for the Property. Defendants argue that their representation in section 9.4(e) is accurate because no labor was performed or materials supplied to it as "Seller for the Property." *Response to DBSI's Motion for Summary Judgment*, p. 10 (Docket No. 91, Att. 1).

First, the Contract provides that the descriptive headings of the sections, in this case the "Liens" heading, "are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions." *Third Burns Affidavit*, Exhibit 4, p. 18, § 12.10 (Docket No. 79, Att. 2). Accordingly, even if no liens existed, if Defendant Greensboro had not fully paid for labor or materials that had been supplied for the property, then it may have breached the warranty made in section 9.4(e).

---

[7](...continued)
that the decision in *Embree* "establishes that at least TRC, *and possibly GOC as well*, had an equitable lien in Signature Place as of the closing") (emphasis added); *Plaintiff's Response to Defendants' Motion for Summary Judgment*, p. 13 (Docket No. 93) (stating "GOC *may have had* an equitable lien against Signature Place") (emphasis added).

Second, section 9.4(e) is subject to more than one interpretation.  It could be read as stating that no labor has been performed for which the Seller has not fully paid and that no materials have been supplied to Seller for the Property which the Seller has not fully paid.  This interpretation of section 9.4(e) would conform to the doctrine of the last antecedent, applied by North Carolina courts in contract interpretation cases.  "By what is known as the doctrine of the last antecedent, relative and qualifying words, phrases, and clauses ordinarily are to be applied to the word or phrase immediately preceding and, unless the context indicates a contrary intent, are not to be construed as extending to or including others more remote."  *HCA Crossroads Residential Ctrs. v. N.C. Dep't of Human Res.*, 398 S.E.2d 466, 469 (N.C. 1990) (applying grammar rules as an aid to interpreting a written instrument).  Applying this principle, the phrase "to Seller for the Property" is applied to the phrase immediately preceding it, i.e., "nor materials supplied to," and nothing in the clause would require the labor to be performed by the Seller or to be contracted for by the Seller.  It would appear that the clause would require only that labor has been performed and the Seller has not fully paid for the labor.

Conversely, using the term "Seller for the Property," as Defendants suggest, would require that the provision be read to provide that no labor has been performed "to Seller for the Property" for which the Seller has not fully paid.  Because the language in 9.4(e) is ambiguous and both interpretations are reasonable, a genuine issue of material fact exists as to what Defendant Greensboro warranted in section 9.4(e) and, therefore, interpretation of the contract is for the trier of fact.  *See Holshouser v. Shaner Hotel Group Props. One Ltd. P'ship*, 518 S.E.2d 17, 23 (N.C. Ct. App. 1999) (explaining that "[a]n ambiguity exists where the language of the contract is fairly and reasonably susceptible to either of the constructions asserted by the

ORDER - 19

parties") (citation and internal quotation marks omitted); *Int'l Paper Co. v. Corporex Constructors, Inc.*, 385 S.E.2d 553, 556 (N.C. Ct. App. 1989) (stating that a contract is ambiguous when the "writing leaves it uncertain as to what the agreement was").  Therefore, a genuine issue of material fact exists regarding whether Defendant Greensboro breached the Contract by making the section 9.4(e) warranty when work had commenced on the tenant upfit improvements (work to which Greensboro ultimately would contribute payment, albeit indirectly).  The labor performed for the tenant improvements had already commenced on the property at the time the Contract was executed, and Greensboro had not yet reimbursed (or paid) TRC or GOC for this labor.  Accordingly, regardless of whether equitable liens had been created, Defendants still may have breached section 9.4(e).  Thus, summary judgment on this claim is not appropriate.

Defendant Greensboro also defends against Plaintiff's breach of contract claim by arguing that, because the tenant upfit allowances did not become due and payable until after the September 30, 2004 Closing, and Plaintiff assumed all of the obligations of Greensboro under the leases after that date, Plaintiff is the party responsible for paying the allowances.  It is noteworthy that each of the leasing agreements provided for conditions to payment of the tenant upfit allowances, and those conditions had not been met as of September 30, 2004.  The TRC lease provided that "[t]he Tenant Upfit Allowance will be paid to Lessee [TRC] upon completion of the Tenant Improvements, issuance of a Certificate of Occupancy for the Premises, and Contractor's Waiver of Lien."  *Graham Affidavit*, Exhibit A at Art. XX of Ex. C (Docket No. 65, Att. 1).  The City of Greensboro issued a Certificate of Occupancy for the premises in April of 2004—almost four months before DBSI executed the Assumption.  *McMurray Affidavit*, ¶ 3

ORDER - 20

(Docket No. 56. Att. 5).  However, although the construction work was "substantially completed" in April, 2004, the contractor did not execute a lien waiver until January 21, 2005, and TRC did not request payment for the Tenant Upfit Allowance until February 25, 2005. *Graham Summary Judgment Affidavit*, Exs. F, G (Docket No. 80, Att. 7); *Plaintiff's Statement of Undisputed Material Facts*, ¶¶ 27, 30 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts*, ¶¶ 27, 30 (Docket No. 94).  Thus, it would appear that the obligation to pay TRC for the improvements did not arise until January 21, 2005.

Similarly, the GOC lease provided that the Tenant Upfit Allowance would be paid "upon completion of the Tenant Improvements and issuance of a Certificate of Occupancy for the Premises."  *Plaintiff's Statement of Undisputed Material Facts*, ¶ 28 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts*, ¶ 28 (Docket No. 94).  The lease specified that the "Lessor shall pay the Tenant Upfit Allowance upon completion of the Tenant Improvements as evidenced by a certificate of occupancy and delivery of a lien waiver signed by any person or entity who performed work or supplied materials for upfit of the Premises." *Graham Affidavit*, Exhibit D at Art. XXI of Ex. C (Docket No. 65, Att. 2).  The City of Greensboro did not issue a certificate of occupancy until November 2004, after the September Closing on the purchase of Greensboro Place and DBSI Housing's Assumption of the leases. *McMurray Affidavit*, ¶ 5 (Docket No. 56, Att. 5).

For these reasons, Plaintiff assumed the obligation to pay for the tenant upfit allowances under the Assumption agreement.  Plaintiff has made these payments, but argues that, because Defendants breached 9.4(e) of the contract and their duty of good faith and fair dealing, Plaintiff has suffered damages in the amount of the upfit allowances.  In other words, even if Plaintiff

assumed the obligation to pay the upfit allowances, it may still be able to recover the amounts

paid if it can establish that Defendants breached the Contract and this breach caused damages in

the amount of the upfit allowances and associated costs. For this reason, the fact that Plaintiff

assumed the obligation to pay the upfit allowances does not operate to excuse any breach of

section 9.4(e) or the duty of good faith and fair dealing.

**C.**     **Plaintiff's Claim for Breach of the Covenant of Good Faith and Fair Dealing**

Plaintiff's second claim for breach of contract is based on the covenant of good faith and

fair dealing. "[A] party who enters into an enforceable contract is required to act in good faith

and to make reasonable efforts to perform his obligations under the agreement." *Maglione v.*

*Aegis Family Health Ctrs.*, 607 S.E.2d 286, 291 (N.C. Ct. App. 2005) (quoting *Weyerhaeuser*

*Co. v. Bldg. Supply Co.*, 253 S.E.2d 625, 627 (1979)). Plaintiff claims that Defendants breached

the covenant of good faith and fair dealing by refusing to pay for TRC's and GOC's tenant

improvements and by providing Plaintiff with tenant estoppel certificates for both TRC and GOC

containing allegedly false representations that "Tenant asserts no claim against Landlord in

regard to any obligation of Landlord relating to the Premises." *Plaintiff's Memorandum in*

*Support of Motion for Summary Judgment*, pp. 10-11 (Docket No. 79, Att. 1).

Plaintiff argues that the tenant estoppel certificates were false because TRC and GOC

had completed work on the tenant upfits prior to the time Greensboro submitted the tenant

estoppel certificates to Plaintiff. Plaintiff notes that North Carolina law defines "claim" to

include "a right to payment, whether . . . fixed, contingent, matured, unmatured, disputed,

undisputed, legal, equitable, secured, or unsecured." N.C. Gen. Stat. § 39-23.1(3) (defining

"claim" for purposes of the Uniform Fraudulent Transfer Act); *see also* Black's Law

ORDER - 22

DICTIONARY 240-41 (7th ed. 1999) (providing a similar definition for "claim"). Based on this definition, TRC and GOC may have had "claims" against Greensboro when they commenced the tenant upfits because a right to payment had accrued, even though it was "contingent" on certain conditions, such as completion of the improvements and securing a certificate of occupancy and waiver of liens.

Defendants respond that, even if the certificates contain false representations, *Greensboro* did not represent anything in the Tenant Estoppel certificates. *Response to DBSI's Motion for Summary Judgment*, p. 12 (Docket No. 91, Att. 1). Rather, the certificates were signed by TRC and GOC representatives and contained clauses stating that the "undersigned acknowledges that Purchaser [DBSI Housing] and Landlord [Greensboro] are relying on (and will rely) on the truth and accuracy of the representations made herein." *Graham Affidavit*, Exhibits N, O (Docket No. 65, Att. 6). Although Defendants' position is technically correct, it also may be true that Defendants prepared the forms for the tenants' review and then delivered the certificates to Plaintiff, knowing that Plaintiff might consider the information contained in the certificates when conducting its due diligence.

At the hearing on March 15, 2006, the parties disagreed about whether Defendant Sullivan or some other employee of Defendant Greensboro had prepared the certificates. The evidence in the record does not conclusively establish who prepared the certificates.[8] *See, e.g.*, *Third Burns Affidavit*, Exhibit C, p. 93 (Docket No. 79, Att. 3). Defendants argue that, even if someone at Greensboro prepared the certificates, they were reviewed by GOC and TRC and the

---

[8] Counsel for Plaintiff represented at the hearing that Tom McMurray may have information on who prepared the certificates, but this information is not in the record and cannot be considered by the Court for summary judgment purposes.

substantive information in the certificates was provided by GOC and TRC. *Response to DBSI's Statement of Undisputed Material Facts*, ¶ 31 (Docket No. 94). Moreover, the responsible parties at GOC and TRC testified at depositions that they believed their representations in the certificates were accurate. *See, e.g., Graham Affidavit*, Exhibit S at pp. 24-25 (Docket No. 80, Att. 3). However, even if Defendants did not prepare the certificates or provide any of the substantive information in the certificates, a jury could find that Defendants' delivery of the certificates as required by the Contract,[9] especially if coupled with a knowledge that the information contained in the certificates was misleading or false, could rise to the level of a breach of the duty of good faith and fair dealing.

For these reasons, the Court cannot determine as a matter of law that Defendants' conduct in initially preparing and/or delivering the tenant estoppel certificates (to satisfy a condition in the parties' Contract) amounts to a breach of the covenant of good faith and fair dealing. Nor can it conclude the opposite. Accordingly, because genuine issues of material facts remain regarding whether Defendants can be responsible for the representations made in the estoppel certificates and whether such representations would violate the duty of good faith and fair dealing, Defendants' motion for summary judgment on this claim is denied.

---

[9] Section 8.7 of the Contract states: "As a condition of Closing, [DBSI Housing] shall have received, on or before the Closing Date, an Estoppel Certificate . . . substantially in the form as attached." *Graham Affidavit*, Exhibit E, p. 11 (Docket No. 65, Att. 3). The attached form included a line stating that "Tenant asserts no claim against Landlord in regard to any obligation of Landlord relating to the Premises." *Id.* This exact language is used in the Tenant Estoppel Certificates executed by TRC and GOC.

ORDER - 24

**D.**     **Plaintiff's Claim for Recovery of TRC's Prepaid Rent Deposit**

It is undisputed that TRC made a Prepaid Rent Deposit to Greensboro in the amount of

$2,428.13, by check dated January 7, 2004, for application to the rental period of October 19 to

November 19, 2004.  *Plaintiff's Statement of Undisputed Material Facts*, ¶ 16 (Docket No. 79,

Att. 2); *Burns Affidavit*, Exhibit B (Docket No. 56, Att. 2).  Section 8.4(a) of the parties'

Contract provides that Plaintiff "shall receive a credit for the amount of any prepaid rents."

*Graham Affidavit*, Exhibit E (Docket No. 65, Att. 3).  At Closing, Greensboro did not credit

DBSI for the TRC prepaid rent.  *Plaintiff's Statement of Undisputed Material Facts*, ¶ 17

(Docket No. 79, Att. 2).  Plaintiff requests summary judgment on its claim for breach of contract

for Defendants' failure at Closing to credit Plaintiff for TRC's prepaid rent.

Defendants' only defense to this claim is that they are entitled to a setoff or recoupment

for Plaintiff's own failure to account for or reimburse Defendant Greensboro for amounts owing

to Greensboro for "[a]ny rents or other charges subsequently collected by Purchaser [DBSI

Housing, Inc.] which are owing to Seller [Greensboro] by tenant or occupants of the Real

Property for periods prior to the Closing Date," as required by the Section 8.4 of the parties'

Contract.  *Answer to Second Amended Complaint*, ¶¶ VI, VIII (Docket No. 90).  Greensboro has

presented no evidence establishing the amount of any such setoff.  The only information

submitted by Defendants that indicates DBSI may owe Greensboro something under this section

is an April 2005 letter sent by Greensboro's counsel requesting that DBSI pay any post-closing

prorations to Greensboro.  *See Graham Affidavit in Opposition to Motion for Summary*

*Judgment*, Exhibit D (Docket No. 91, Att. 1).  However, this letter does not specify how much

may be owed pursuant to section 8.4.

ORDER - 25

Thus, there is no evidence in the record at this point in the proceedings to demonstrate that Plaintiff actually did collect any rent or other charges that are for the period prior to the September 30, 2004 Closing date and owing to Defendants.  *See Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998) (explaining that "to defeat a summary judgment motion, the non-moving party must demonstrate that the evidence is such that a reasonable jury could return a verdict in his or her favor").  Accordingly, Defendants have not established the setoff as a defense to Plaintiff's prepaid rent claim.  Although Greensboro may be able to recover any amounts owed to it under section 8.4 of the Contract by way of its counterclaim, it does not change the fact that Greensboro owes Plaintiff $2,428.13 for TRC's prepaid rent.  Accordingly, summary judgment in favor of Plaintiff on this claim is warranted.

**E.      Defendants' Counterclaim to Recover the Commission Paid to Alliance Commercial**

Defendants have asserted a breach of contract counterclaim, claiming that DBSI breached the terms of the Assumption by failing to pay the second half of a leasing commission to Alliance Commercial.  *Answer to Second Amended Complaint*, ¶¶ IV, VII, X (Docket No. 90). Defendants claim that "DBSI expressly assumed that obligation" under the Assumption Agreement.  *Defendants' Memorandum in Support of Motion for Summary Judgment*, p. 11 (Docket No. 80, Att. 1).  Both parties request that summary judgment be entered in their favor on this claim.

Although Plaintiff "assume[d] and agree[d] to pay any leasing commissions that become payable after [September 30, 2004]," *Plaintiff's Statement of Undisputed Material Facts*, ¶ 5 (Docket No. 79-2); *Response to DBSI's Statement of Undisputed Material Facts*, ¶ 5 (Docket No. 94), it argues that the conditions for the commission to become payable have not been

satisfied and, therefore, it is not liable for Alliance Commercial's commission, *Plaintiff's Memorandum in Support of Motion for Summary Judgment*, p. 4 (Docket No. 79, Att. 1).

Prior to entering into a lease with GOC, Greensboro entered into a Broker Agency and Commission Agreement Lease Transaction ("Commission Agreement") with Alliance Commercial on February 17, 2004.  *Graham Affidavit*, Exhibit B (Docket No. 65, Att. 1).  The Commission Agreement provides that the Listing Agency (Greensboro) "agrees to pay" Alliance Commercial four percent "of the total commission received by Listing Agency for the transaction, *payable when Listing Agency receives the commission*."  *Id.* (emphasis added); *Plaintiff's Statement of Undisputed Material Facts*, ¶ 10 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts*, ¶ 10 (Docket No. 94).  The Commission Agreement later explains that the "Listing Agency's Listing Agreement specifies the commission is payable as follows":  "One-half commission to be paid upon Lease Execution; one-half commission to be paid upon occupancy by Tenant."  *Graham Affidavit*, Exhibit B (Docket No. 65, Att. 1).  Although Greensboro never received a commission for the GOC lease as the "listing agent," it paid the first half of the lease commission to Alliance when it executed the lease with GOC.  *Plaintiff's Statement of Undisputed Material Facts*, ¶¶ 11, 12 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts*, ¶¶ 11, 12 (Docket No. 94).

Greensboro acknowledges that it has never received a commission as the listing agency for the GOC lease.  However, Greensboro argues that the specific language of the agreement provides that "regardless of whether Greensboro received a commission," Alliance Commercial was to receive a leasing commission.  *Response to DBSI's Motion for Summary Judgment*, p. 5 (Docket No. 91).

ORDER - 27

The Agreement's terms are clear and unambiguous on its face, allowing for the Court to interpret the agreement as a matter of law.  *Dep't of Transp. v. Idol*, 440 S.E.2d 863, 864 (N.C. Ct. App. 1994).  Greensboro agreed to pay Alliance Commercial four percent of the total commission *received by Greensboro* for the transaction, payable when Greensboro received the commission.  The Agreement further explains that Greensboro was to receive one-half of its commission upon lease execution and the other half upon occupancy by the tenant.  Any evidence that the parties to the Agreement—Greensboro and Alliance Commercial—intended a different payment arrangement is barred by the parol evidence rule.  "The parol evidence rule prohibits the admission of parol evidence to vary, add to, or contradict a written instrument intended to be the final integration of the transaction."  *Mayo v. North Carolina State Univ.*, 608 S.E.2d 116, 121 (N.C. Ct. App. 2005), affirmed by 619 S.E.2d 502 (N.C. 2005) (citation and internal quotation marks omitted).  Thus, the fact that Greensboro paid the first half of the leasing commission to Alliance Commercial, and other information about the parties' course of performance under the Agreement, are irrelevant to the Court's interpretation of the Agreement. *See Response to DBSI's Motion for Summary Judgment*, pp. 3, 6 (Docket No. 91).  Accordingly, because as a matter of law the leasing commission has not become "payable after" September 30, 2004, as required for DBSI Housing to assume its payment under the Assumption Agreement, summary judgment in favor of Plaintiff on Defendants' counterclaim for breach of contract (count one) is granted.  Concomitantly, the Court will deny Defendants' request for summary judgment on this claim.

ORDER - 28

**F.**   **Plaintiff's Claim for Fraud**

Defendants request summary judgment on Plaintiff's fraud claim.  Defendants argue that (1) Plaintiff's own negligence estops it from asserting fraud in the inducement, and (2) DBSI's fraud claim fails as a matter of law.  *Defendants' Memorandum in Support of Motion for Summary Judgment*, pp. 15-18 (Docket No. 80, Att. 1).  To make a claim for fraud there must be evidence of:  (1) a representation; (2) its falsity; (3) its materiality; 4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on the truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.  *Aspiazu v. Mortimer*, 139 Idaho 548, 550, 82 P.3d 830, 832 (2003).

In the summary judgment briefing, Plaintiff explains that its fraud claim "is grounded on the fact that Defendants made numerous representations to DBSI that there were no amounts payable to either TRC or GOC under their respective leases."  *Plaintiff's Response to Defendants' Motion for Summary Judgment*, p. 6 (Docket No. 93).  Plaintiff argues that, because of these "fraudulent representations, DBSI did not *cancel* the Contract prior to the running of the due diligence review period."  *Id*.  Plaintiff asserts that its fraud claim thus has nothing to do with inducement.  *Id*. at pp. 6-7.

The Court agrees with Defendants that Plaintiff's fraud claim, however worded, is a claim for fraud in the inducement.  Essentially, Plaintiff claims that Defendants' representations led to its decision to not cancel the contract and instead to proceed with the purchase of Signature Place.  However, the Court disagrees with Defendants' assertion that Plaintiff's own negligence estops it from asserting fraud.

ORDER - 29

While the terms of a written contract normally will control, *see, e.g.*, *West v. Prater,* 57 Idaho 583, 587-88, 67 P.2d 273, 277-78 (1937), "Idaho law firmly allows that '[f]raud in the inducement is always admissible to show that representations by one party were a material part of the bargain.'" *Aspiazu*, 139 Idaho at 551, 82 P.3d at 833 (quoting *Thomas v. Campbell,* 107 Idaho 398, 402, 690 P.2d 333, 337 (1984)).  Here, although the written contract between the parties provides that DBSI would assume all obligations under the GOC and TRC leases, there is evidence indicating that Defendants may have represented to DBSI Housing that these obligations did not include the GOC and TRC tenant upfit allowances or that Defendants may have allowed DBSI Housing to be misled about the obligations it was assuming.  Because the parties' Contract does not specifically address who is responsible for these allowances and information provided pursuant to the Contact (i.e., the estoppel certificates) makes it appear there were no outstanding obligations regarding the TRC and GOC leases, the rule that Plaintiff may be estopped by its own negligence in failing to read the Contract does not apply.  *Compare Irwin Rogers Ins. Agency v. Murphy*, 122 Idaho 270, 273, 833 P.2d 128, 131 (1992) (defendant signed a promissory note including all the terms to which he was bound that he thought was just an insurance paper and was not excused from the contract because of his own negligence of failing to read the note).

Even if Douglas Swenson, the President of DBSI Housing, had read the entire agreement before he signed it, nothing in it would have specifically informed him that Plaintiff was assuming the GOC and TRC allowances.  While the TRC and GOC leases contained information indicating that the obligation to pay for the tenant upfits did not accrue until certain conditions were met, the tenant estoppel certificates indicated that TRC and GOC had no claims against the

Landlord, (Defendant Greensboro).  Thus, the appropriate rule here is that "agreements and communications prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . .  fraud." *Tusch Enterprises v. Coffin,* 113 Idaho 37, 45 n. 5, 740 P.2d 1022, 1030 n. 5 (1987) (citation and internal quotation marks omitted).  In other words, fraud can "provide a basis for demonstrating that the parties agreed to something apart from or in addition to the written documents."  *Aspiazu*, 139 Idaho at 551, 82 P.3d at 833.

In the present case, there are issues of fact sufficient to prevent summary judgment on Plaintiff's fraud claim.  Plaintiff alleges that Mr. Sullivan made representations by telephone to Eric Gordon upon which Plaintiff relied when entering into the contract,[10] and alleges that the tenant estoppel certificates also misrepresent the liabilities Plaintiff would assume under the Contract.   As explained above, because Defendants may have prepared and delivered the estoppel certificates, and may have been aware that the certifications were not entirely accurate, it is possible that a jury could attribute any misrepresentation in the certificates to Defendants. *See, e.g., Watts v. Krebs*, 131 Idaho 616, 619-20, 962 P.2d 387, 390-91 (1998) (determining that a seller of real property with superior knowledge may, by failing to disclose material facts, commit fraud, even if seller makes no false statements).  Additionally, because the Contract required delivery of the tenant estoppels, any reliance on them may be justified.  Accordingly, genuine issues of material fact exist and Defendants' request for summary judgment on Plaintiff's fraud claim is denied.

---

[10]  Defendants argue that Douglas Swenson could not have relied on these representations; however, there is information in the record indicating that Swenson relied on the information provided by Eric Gordon and that Eric Gordon may have relied on Sullivan's alleged representations.

ORDER - 31

**G.**     <u>**Plaintiff's Claim Based on Deceptive or Unfair Practices**</u>

Plaintiff also seeks to recover damages against Defendants under the Idaho Consumer

Protection Act ("ICPA"), I.C. §§ 48-601 *et seq.*, on the ground that Defendant Sullivan's

representations to Plaintiff "constitute unfair or deceptive acts or practices made in the conduct

of and affecting commerce." *Second Amended Complaint*, ¶ 24 (Docket No. 55).  The ICPA

specifically defines what constitutes a deceptive act or practice.  Idaho Code § 48-603 begins:

"The following unfair methods of competition and unfair or deceptive acts or practices in the

conduct of any trade or commerce are hereby declared to be unlawful, where a person knows or

in the exercise of due care should know, that he has in the past, or is . . . ."  The statute then lists

nineteen types of conduct that constitute either an unfair method of competition or an unfair or

deceptive act or practice.  *Id*.  "There is nothing in the wording of Idaho Code § 48-603

indicating that the list of conduct is merely illustrative."  *State ex rel. Wasden v. Daicel

Chemical Indus., Ltd*., 141 Idaho 102, 107-8, 106 P.3d 428, 433-34 (2005).  Thus, the conduct at

issue must be contained in the list for Plaintiff to make a claim for a violation of the ICPA.

There is at least one provision on the list that could apply to the circumstances presented

here.  Idaho Code § 48-603(17) states that it is unlawful to engage "in any act or practice which

is otherwise misleading, false, or deceptive to the consumer."  The word "consumer" is not

defined by the ICPA and nothing in the Act indicates that the legislature intended this provision

to apply only to personal consumers and not to business consumers such as Plaintiff.  In fact, the

legislature stated that the purpose of the ICPA is "to protect both consumers and businesses

against unfair methods of competition and unfair or deceptive acts and practices in the conduct

of trade or commerce, and to provide efficient and economical procedures to secure such

ORDER - 32

protection."  Idaho Code § 48-601.  Additionally, the legislature specified its intent that this

chapter "be remedial and so construed."  *Id.*  In other words, "[t]he ICPA should be construed

liberally."  *Fenn v. Noah*, ___ P.3d ___, 2006 WL 910033, *3 (Idaho Apr. 11, 2006).

For these reasons, the Court concludes as a matter of law that the ICPA could apply to

Plaintiff's allegations and, thus, summary judgment in favor of Defendants is not warranted.  *See*

*White v. Mock*, 140 Idaho 882, 891, 104 P.3d 356, 365 (2004) (explaining that whether a statute

applies is a matter of law to be determined by the Court).

## IV.

### MOTION TO FILE THIRD AMENDED COMPLAINT

**A.**   <u>**Standards of Law**</u>

"The question of whether to permit a claim for punitive damages is substantive in nature

and accordingly is controlled by relevant Idaho case law."  *Strong v. Unumprovident Corp.*, 393

F. Supp. 2d 1012, 1025 (D. Idaho 2005).  Under Idaho law, a party may seek punitive damages

only with leave of the Court.  Idaho Code § 6-1604(2).  After a hearing on the matter, the Court

"shall allow the motion to amend the pleadings if, after weighing the evidence presented, the

court concludes that, the moving party has established at such hearing a reasonable likelihood of

proving facts at trial sufficient to support an award of punitive damages."  *Id*.  The standard at

trial is proof, "by clear and convincing evidence,[of] oppressive, fraudulent, malicious or

outrageous conduct by the party against whom the claim for punitive damages is asserted."

Idaho Code § 6-1604(1).

Punitive damages may be recovered against a corporation if "an officer or director

participated in, or ratified, the conduct underlying the punitive damage award."  *Vendelin v.*

*Costco Wholesale Corp.*, 140 Idaho 416, 430-31, 95 P.3d 34, 48-49 (2004) (citations omitted).

However, "while punitive damages may be recovered in a contract action, they are not favored in

the law and therefore should be awarded only in the most compelling circumstances; they should

be awarded cautiously and within narrow limits." *Gen'l Auto Parts Co., Inc. v. Genuine Parts*

*Co*., 132 Idaho 849, 852, 979 P.2d 1207, 1210 (1999) (quoting *Cuddy Mountain Concrete, Inc. v.*

*Citadel Constr., Inc.*, 121 Idaho 220, 227, 824 P.2d 151, 158 (Ct.App. 1992)) (internal citation

marks omitted).  "The plaintiff must show that the defendant acted in a manner that was an

extreme deviation from reasonable standards of conduct, and that the act was performed by the

defendant with an understanding of or disregard for its likely consequences." *Id*. at 852-53, 979

P.2d at 1210-11 (citations omitted).  Moreover, the "justification for punitive damages must be

that the defendant acted with an extremely harmful state of mind, whether that be termed

'malice, oppression, fraud or gross negligence;' 'malice, oppression, wantonness;' or simply

'deliberate and willful.'" *Id*.; *see also Jones v. Panhandle Distrib., Inc.,* 117 Idaho 750, 755, 792

P.2d 315, 320 (1990).

Therefore, when the moving party's claims are reasonably disputed and there is

substantial evidence that supports the non-moving party's claims, a motion to amend to assert

punitive damages will not be allowed.  *See Strong*, 393 F. Supp. 2d at 1026 (finding the plaintiff

had not established a reasonable likelihood of proving by a preponderance of the evidence "the

requisite 'extremely harmful state of mind' and 'extreme deviation from reasonable standards'"

because the cause of the plaintiff's disability, which was in issue, was "reasonably disputed and

there [wa]s substantial medical evidence that support[ed] a conclusion that [the plaintiff] suffers from a sickness") (citing *Kuntz v. Lamar Corp.*, 385 F.3d 1177, 1187 (9th Cir. 2004)).[11]

The Idaho state courts have also made clear, with respect to punitive damages claims, that the decision whether to submit the punitive damages question to a jury rests within the sound discretion of the trial court. *Manning*, 830 P.2d at 1190 (citing *Hoglan v. First Sec. Bank*, 120 Idaho 682, 819 P.2d 100 (1991); *Eddins Constr., Inc. v. Bernard*, 119 Idaho 340, 806 P.2d 433 (1991); *Soria*, 111 Idaho 594, 726 P.2d 706). In this respect, the federal courts are in accord with Idaho state substantive and procedural law. *Forman v. Davis*, 371 U.S. 178 (1962).

Accordingly, though Federal Rule of Civil Procedure 15(a) encourages the liberal granting of motions to amend pleadings, due to the strict conditions precedent to and the disfavor of punitive damages, a plaintiff will be allowed to amend the pleadings to assert a claim for punitive damages only if, after weighing the evidence presented, the Court concludes that Plaintiff has established a reasonable likelihood of proving, by clear and convincing evidence, that Defendants' conduct was oppressive, fraudulent, malicious, or outrageous. *See Vendelin*, 140 Idaho at 423, 95 P.3d at 41.

---

[11] *Strong* involved the "preponderance of the evidence" standard required in Idaho Code § 6-1604 before its amendment in 2003. Section 6-1604 now places a higher burden on the moving party, i.e., a requirement for "clear and convincing evidence." *See also* BLACK'S LAW DICTIONARY 596 (8th ed. 2004) ("***clear and convincing evidence.*** . . . This is a greater burden than preponderance of the evidence . . . ."). Therefore, the *Strong* standard remains applicable. That is, if the moving party's claims are reasonably disputed and there is substantial evidence that supports the non-moving parties' claims, the moving party has not met the "preponderance of the evidence" standard; therefore, the moving party has also not met the more stringent "clear and convincing evidence" standard.

ORDER - 35

**B.**    **Discussion**

Plaintiff points to the following circumstances to support its claim that punitive damages are appropriate in this case.  First, Plaintiff claims that Defendant Sullivan, a representative of Defendants, falsely represented that Defendants would be responsible for the GOC and TRC Tenant Upfit Allowances.  Second, Plaintiff contends that it relied on an email from Defendant Sullivan referring to the GOC Tenant Upfit Allowance as "our allowance" to conclude that Greensboro would pay the GOC tenant upfit allowance.  *Gordon Affidavit*, ¶ 3 & Exhibit A (Docket No. 56, Att. 5).  Finally, Plaintiff points to tenant estoppel certificates executed by TRC and GOC, but allegedly initially prepared by Defendants, as misrepresentations of the financial liabilities Plaintiff would assume under the TRC and GOC leases.

These circumstances also serve as the basis for Plaintiff's fraud claim, and fraud is "one type of mental state, which *might* support an award of punitive damages."  *Myers v. Workmen's Auto Ins. Co*., 140 Idaho 495, 503, 95 P.3d 977, 985 (2004) (emphasis added).  Merely because fraud is *alleged*, however, does not necessarily warrant an award of punitive damages.  *See Trees v. Kersey*, 138 Idaho 3, 11, 56 P.3d 765, 773 (Idaho 2002) (plaintiff demonstrated fraud at trial, but the Supreme Court of Idaho vacated the punitive damages award).[12]  The issue presented here then, is whether Plaintiff's allegations of fraudulent or misrepresentative behavior by Defendants establish "a reasonable likelihood" that it will be able to prove facts sufficient to

---

[12]  While the facts in *Trees* are different from the facts presented in the instant action, *Trees* is an example of a case in which a fraud claim may be proven, but a punitive damages award is nonetheless not warranted.  As the court in *Trees* noted, "[p]unitive damages are not favored in law and should be awarded in only the most unusual and compelling circumstances."  138 Idaho at 11, 56 P.3d at 773.

ORDER - 36

support an award of punitive damages at trial under the "clear and convincing evidence" standard.

Defendants argue that the one alleged telephone conference between DBSI Housing employee Eric Gordon and Defendant Sullivan is not by itself, or in combination with the other allegations, sufficient to support a claim for punitive damages.  Plaintiff relies primarily on statements in Eric Gordon's affidavit and deposition testimony to support its allegation that Sullivan made a false representation.  Gordon averred that Sullivan told him "Greensboro was paying all costs associated with the TRC Lease and GOC Lease, as well as the other leases reflected on the rent roll, which costs include the tenant improvement allowances owed to TRC and GOC."  *Gordon Affidavit*, ¶ 4 (Docket No. 56, Att. 5).  During his deposition testimony, Gordon testified that he asked Mr. Sullivan if he had the right information, the correct leases, and the correct valuations for the leases, and Sullivan stated "Yes, that is correct."  *Graham Supplemental Affidavit*, Exhibit A, p. 22 (Docket No. 83).

Defendants argue that these generalized comments are insufficient to support a particularized fraud claim, and are also insufficient to support an allegation of fraudulent conduct to support a punitive damages claim.  The Court agrees that these comments alone do not establish a reasonable likelihood that Plaintiff could prove *by clear and convincing evidence* at trial facts sufficient to support an award of punitive damages.  To justify punitive damages, the Plaintiff must demonstrate that Defendants acted with an extremely harmful state of mind and in an "extreme deviation from reasonable standards of conduct."  *Gen'l Auto Parts Co.*, 132 Idaho at 852-53, 979 P.2d at 1210-11.  Nothing in the record indicates that Defendant Sullivan acted with the requisite extremely harmful state of mind.

ORDER - 37

Plaintiff also points to a June 11, 2004 email, which was forwarded by Sullivan to Eric Gordon on July 27, 2004, near the time the conversation between Sullivan and Gordon allegedly occurred.  The email from Sullivan states:  "Also, we've been told that the new tenant ([GOC]) is going to spend at least an additional $15 sf ($450,000) for TI over our allowance."  *See Gordon Affidavit*, Exhibit A (Docket No. 56, Att. 5).  Plaintiff argues that Sullivan's use of the word "our," instead of the word "your," represented to Gordon that Greensboro would be paying the GOC upfit allowance.  *Plaintiff's Memorandum in Support of Motion for Leave to File Third Amended Complaint*, p. 7 (Docket No. 56, Att. 1).

Defendants point out that at the time the email was originally sent, on June 11, 2004, the parties had not yet entered into the Contract for the purchase of Signature Place and it was still Defendants' responsibility to pay for the upfit allowance.  Thus, from Sullivan's perspective it was still "our" allowance.  Also, the email was forwarded on July 27, 2004, two months before DBSI Housing assumed any responsibilities under the GOC lease.  Thus, if the conditions for payment of the upfit allowance had been met before September 30, 2004, when DBSI Housing assumed the lease, Defendant Greensboro would have been responsible for the upfit allowance.  Considering the timing of the email and the inference required to find that Sullivan's use of the word "our" misrepresented anything to Gordon or DBSI Housing, the Court finds that this email, either alone or in combination with any other evidence, does not establish a reasonable likelihood that Plaintiff could prove facts at trial sufficient to support an award of punitive damages at trial with "clear and convincing evidence."

The final evidence relied on by Plaintiff to support a punitive damages claim are the tenant estoppel certificates executed by TRC and GOC.  Both certificates state that "Tenant

ORDER - 38

asserts no claim against Landlord in regard to any obligation of Landlord relating to the Premises." *Graham Affidavit*, Exhibits N, O (Docket No. 65, Att. 6).  The TRC certificate additionally states that there is no prepaid rent.  *Id*. at Exhibit O.

Defendants argue that the tenant estoppel certificates do not constitute a representation *by Greensboro* that TRC and GOC had no unpaid claims against Greensboro, because the certificates were signed by TRC and GOC representatives and contain clauses stating that the "undersigned acknowledges that Purchaser [DBSI Housing] and Landlord [Greensboro] are relying on (and will rely) on the truth and accuracy of the representations made herein." *Graham Affidavit*, Exhibits N, O (Docket No. 65, Att. 6).  Plaintiff responds that Defendants prepared and delivered the estoppel certificates, knowing that the information was misleading and that the TRC representation regarding unpaid rent was false.  *Reply*, p. 4 (Docket No. 67).

The Court notes that at least the TRC certificate contains a false statement because TRC had prepaid rent to Greensboro in the amount of $2,428.13 on January 7, 2004.  *Reply*, p. 4 (Docket No. 67).  TRC's controller, Craig Kumpf, however, took responsibility for this oversight, *Graham Affidavit*, Exhibit Q, p. 24 (Docket No. 65, Att. 6), and, even if Greensboro initially prepared the certificate, this one oversight is not sufficient to establish a fraudulent state of mind for purposes of punitive damages.  Additionally, there exists a dispute of fact as to who prepared the certificates.

Moreover, Defendants contend there are no additional misrepresentations in the certificates because no "claims" existed to assert for either GOC or TRC.  *Memorandum in Opposition*, p. 16 (Docket No. 64).  The GOC tenant upfit was not completed at the time the certificates were filled out or by the September 30, 2004 Closing.  As provided in the GOC lease, the "Lessor shall pay

ORDER - 39

the Tenant Upfit Allowance upon completion of the Tenant Improvements as evidenced by a

certificate of occupancy and delivery of a lien waiver signed by any person or entity who

performed work or supplied materials for upfit of the Premises." *Id.*, Exhibit D at Art. XXI of

Ex. C. Defendants point out that these conditions for payment of the allowance were not met by

the September 30, 2004 Closing and, therefore, GOC had no claim until after the September 30,

2004 Closing.

Similarly, the TRC lease provides that "[t]he Tenant Upfit Allowance will be paid to

Lessee [TRC] upon completion of the Tenant Improvements, issuance of a Certificate of

Occupancy for the Premises, and Contractor's Waiver of Lien." *Graham Affidavit*, Exhibit A at

Art. XX of Ex. C (Docket No. 65, Att. 1). Although the City of Greensboro issued a Certificate

of Occupancy for the premises in April of 2004—almost four months before DBSI executed the

Assumption—the contractor did not execute a lien waiver until January 21, 2005, and TRC did

not request payment for the Tenant Upfit Allowance until February 25, 2005. *McMurray*

*Affidavit*, ¶ 3 (Docket No. 56. Att. 5); *Graham Summary Judgment Affidavit*, Exs. F, G (Docket

No. 80, Att. 7).

Plaintiff responds that, even though the right to payment may not have not arisen under the

express terms of the tenant upfit provisions, TRC and GOC may have had equitable claims

against Greensboro based on the improvements that had been completed at the time of the

September 30, 2004 Closing. The Court has determined that TRC and GOC did not have

equitable liens at the time of the Closing. Although TRC and GOC had claims contingent on

certain events, the Court concludes that any misrepresentation in the certificates is not sufficient

to create a reasonable likelihood that Plaintiff could prove at trial by clear and convincing

ORDER - 40

evidence that it is entitled to an award of punitive damages.  The certificates were reviewed and signed by TRC and GOC employees and they accepted responsibility for the certificates' accuracy.  These circumstances make it unlikely that Plaintiff will be able to support a punitive damages claim by clear and convincing evidence at trial.

In summary, after carefully weighing the entire record, including the evidence and argument of counsel presented at the hearing on March 15, 2006, the Court concludes that although there is some evidence indicating that Defendants may have allowed Plaintiff to be misled, Plaintiff has not established a reasonable likelihood of proving at trial by clear and convincing evidence that Defendants "acted with an extremely harmful state of mind," *see Gen'l Auto Parts*, 132 Idaho at 853, 979 P.2d at 1211, or any other facts sufficient to support an award of punitive damages.[13]  Accordingly, Plaintiff's Motion for Leave to File Third Amended Complaint Requesting Punitive Damages (Docket No. 56) is denied.

Because Plaintiff cannot assert a claim for punitive damages, the information sought by interrogatories numbered 17 through 24 is not relevant, Plaintiff's Motion to Compel Responses to Punitive Damages Discovery is denied as irrelevant to the issues in this action.  *See* Fed. R. Civ. P. 26 (providing that the Court may order discovery of any matter *relevant* to the subject matter involved in the action).

---

[13]  The Court notes that it has allowed the fraud claim to go forward but denied the punitive damages claim based on the fraud allegations.  The summary judgment decision rested on whether genuine issues of material facts existed with regard to the elements of Plaintiff's fraud claim, but the punitive damages decision was made in light of the clear and convincing trial evidence standard.  Although the ruling may appear inconsistent, it is based two different standards of law.  Moreover, even when a fraud claim has been proved, punitive damages are not always allowed.  *See Trees*, 138 Idaho at 11, 56 P.3d at 773.

ORDER - 41

**V.**

**ORDER**

Accordingly, IT IS HEREBY ORDERED:

1.      Plaintiff's claims for (i) unfair and deceptive acts/practices based on North Carolina law, (ii) negligent representation, and (iii) unjust enrichment, contained in its Second Amended Complaint, are DISMISSED pursuant to Plaintiff's consent.

2.      Defendants' Motion for Summary Judgment (Docket No. 79) is DENIED.

3.      Plaintiff's  Motion for Summary Judgment (Docket No. 80) is GRANTED, in part, and DENIED, in part, as provided in Section III, Parts B, C, D, E, F and G, at pages 15 through 21.

4.      Plaintiff's Motion for Leave to File Third Amended Complaint Requesting Punitive Damages (Docket No. 56) is DENIED.

5.      Plaintiff's Motion to Compel Responses to Punitive Damages Discovery (Docket No. 66) is DENIED.

6.      Plaintiff's Motion to Strike Fifteenth Affirmative Defense and Count Two of Defendants' Counterclaim (Docket No. 95) is DENIED.

DATED:  **May 9, 2006**.

Honorable Larry M. Boyle
Chief U. S. Magistrate Judge

ORDER - 42