IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| DBSI SIGNATURE PLACE, LLC, an Idaho limited liability company, | ) ) ) | |
| Plaintiff/Counterdefendant, | ) ) | Case No. CV 05-051-S-LMB |
| v. | ) ) | **MEMORANDUM DECISION,** |
| BL GREENSBORO, L.P., a Texas limited partnership, LS NORTHLINE, LLC, a Texas limited liability company, and MARK J. SULLIVAN, | ) ) ) ) ) | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| Defendants/Counterclaimants. | ) ) ) | |

I.

INTRODUCTION

A.     The Parties

The claims and counterclaim at issue in this action arose out of the sale of an office

building known as "Signature Place," located in Greensboro, North Carolina.  Defendant BL

Greensboro, L.P. ("Greensboro") sold Signature Place to DBSI Housing ("DBSI Housing")

pursuant to an Earnest Money Contract (the "Contract") executed on July 8 and 9, 2004, by

Greensboro and DBSI Housing.  (Stipulation).[1]  DBSI Housing is the sole member of Plaintiff

DBSI Signature Place LLC ("DBSI" or "Plaintiff"), an Idaho limited liability company.  Plaintiff

_____

    [1]  On May 29, 2007, the parties stipulated to the facts contained in various paragraphs of
their respective proposed findings of fact and conclusions of law.  Pursuant to this agreement,
the word "Stipulation" has been inserted at the end of sentences that contain stipulated facts.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 1**

is the successor-in-interest to DBSI Housing's interest in the Contract out of which this controversy arises.[2]  Tr. Vol. 1 p. 31, Ls. 9-24 (Swenson testimony); (Stipulation).

Defendant Mark J. Sullivan ("Sullivan") is the vice president and secretary of Defendant Northline LLC ("Northline"), which in turn is the general partner of Greensboro.  (Stipulation).

**B.     Factual Background[3]**

The Contract at issue included an agreement for the assumption by DBSI of the Signature Place tenant leases ("Assumption").  At the closing on September 30, 2004 ("Closing"), Douglas L. Swenson ("Swenson"), President of DBSI Housing, executed the Assumption wherein DBSI agreed to "perform all of the obligations of [Greensboro] under the Leases after the date of this Assignment . . . ."  Exhibit C, p. 2 (Assignment of Leases and Assumption).  (Stipulation).

The leases assumed by DBSI at the Closing include one with TRC Staffing Services, Inc. ("TRC"), entered on January 16, 2004, which specifies that the Lessor (Greensboro at the time the lease was executed) "is providing . . . up to $9.00 per rentable square foot for Tenant Improvements ('Tenant Upfit Allowance')."  Exhibit 13.  Another lease assumed by DBSI was executed by Greensboro and Greensboro Orthopedic Clinic, P.A. ("GOC") on June 2, 2004, and provided that the Lessor (again, Greensboro at the time) would "provide $40.00 per rentable square foot for Tenant Improvements ('Tenant Upfit Allowance')."  Exhibit 14.

---

[2]  For ease of reference, both DBSI Housing and DBSI Signature Place will be referred to as Plaintiff and/or DBSI.

[3]  The facts contained in this section are a summary of the Findings of Fact and exhibits discussed and cited in Section IV, *infra*.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 2**

At issue in the June 2007 court trial, and in this Memorandum Decision and Order, is which party should be responsible for payment of these tenant upfit allowances.[4]  Also at issue is whether Defendant Sullivan misrepresented information about the tenant upfit allowances to DBSI and whether Greensboro is entitled to recover a portion of the 2004 operating expenses for Signature Place that were paid to DBSI by the tenants.

**C.    Procedural Background**

On January 31, 2005, DBSI filed suit in Idaho state court; Defendants removed the action to this Court on February 16, 2005.  (Docket No. 1).  DBSI then filed a Second Amended Complaint and Defendants responded with an Answer to Second Amended Complaint and Counterclaim.  (*See* Docket. Nos. 55, 90).  (Stipulation).

Thereafter, both DBSI and Defendants filed a series of motions for summary judgment. (Docket Nos. 79, 80, 113, 114).  The parties stipulated to dismissal of some of their claims and the Court granted summary judgment on other claims.  *See* Orders (Docket Nos. 110, 129). Plaintiff's claims for (i) unfair and deceptive acts/practices based on North Carolina law, (ii) negligent representation, and (iii) unjust enrichment were dismissed pursuant to Plaintiff's stipulation.  Order, p. 42 (Docket No. 110).  Summary judgment was entered in Plaintiff's favor on the following claims:

(1)    Plaintiff's claim for breach of contract to recover $2,428.13 in rent that was prepaid to Greensboro by tenant TRC.  Order, pp. 25-26 (Docket No. 110); and

---

[4]  DBSI has paid the allowances as requested by the tenants, but seeks reimbursement from Greensboro.  *See* Exhibits 4 & 5.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 3**

(2)     Defendants' counterclaim for breach of contract to recover a leasing commission paid by Greensboro to Third-Party Plaintiff Alliance Commercial Properties.  Order, p. 28 (Docket No. 110).

In addition, pursuant to stipulation, Defendants' counterclaim for breach of contract and related affirmative defense, seeking to recover a portion of the Signature Place building operating expenses and taxes recovered by Plaintiff, were dismissed to the extent brought by Defendants Northline and Sullivan.  Order, p. 11, n.10 & p. 18 (Docket No. 129).  However, this counterclaim and defense for recoupment of operating expenses and taxes, to the extent brought by only Defendant Greensboro, was tried to the Court and remains for resolution by this Order.  *See* Answer to Second Amended Complaint, pp. 10, 13-14 (Docket No. 90); Defendants' Trial Memorandum, p. 8 (Docket No. 143).  (Stipulation).  By way of this counterclaim, Greensboro requests damages of $103,497.92 based on its calculations of the 2004 operating expenses collected by DBSI after closing.  Exhibit 39 (DBSI's summary of operating expenses); Tr. Vol. 2, pp. 130-31 & Tr. Vol. 3, pp. 113-114 (Sullivan testimony).

Also still at issue are:

(1)     Plaintiff's fraud claim seeking to recover from all Defendants the $14,175.00 TRC Upfit Allowance, the $1,220,712.00 GOC Upfit Allowance, and the $15,040.20 in interest and attorneys' fees paid to GOC (Count I), Exhibit 8 (Plaintiff's Summary of Claims);[5]

(2)     Plaintiff's claim against all Defendants for violation of the Idaho Consumer Protection Act (Count II); and

---

[5]  At trial, while not acknowledging or admitting liability, defense counsel stipulated to the amount of DBSI's claimed damages.  Tr. Vol. 1, p. 42, l. 25 – p. 48, l. 2.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 4**

(3)   Plaintiff's claims based on breach of contract and breach of the implied covenant of good faith and fair dealing, seeking to recover from Greensboro the $14,175.00 TRC Upfit Allowance, the $1,220,712.00 GOC Upfit Allowance, and the $15,040.20 in interest and attorneys' fees paid to GOC, together with Plaintiff's reasonable attorneys' fees (Count IV); Exhibit 8.

All of these claims were tried to the Court at the request of the parties, all of whom waived their demand for jury trial, *see* Docket No. 140, and will be considered below.

## II.

### MEMORANDUM DECISION & SUMMARY OF RULING[6]

In the May 9, 2006 summary judgment ruling, the Court concluded that even if DBSI at Closing assumed the obligation to pay the upfit allowances, it may still be able to recover the amounts paid to GOC and TRC for those upfits, if it can establish that Defendants breached Section 9.4(e) of the Contract or if Defendants committed fraud or breached the duty of good faith and fair dealing. Order, pp. 21-22 (Docket No. 110). As explained in more detail in this section and in the Findings of Fact set forth below, the evidence and testimony presented at trial were not sufficient to establish that any oral promises not included in the written Contract were made by either party, or that any other reason supports overlooking the plain terms of the Contract, as interpreted based on testimony about the parties' intent in including certain

---

[6] To the extent any of the facts or conclusions stated in this section can be considered Findings of Fact or Conclusions of Law, they are incorporated by reference into the relevant sections below.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 5**

language and terms in the Contract.  In sum, the written documents control the resolution of this case.

**A.      Plaintiff's Claims**

Mike Thomas ("Thomas"), DBSI's former vice-president of acquisitions, and Defendant Sullivan were principals in the negotiation of the Signature Place deal.  Thomas did not testify at the trial.[7]  However, although Defendant Sullivan testified, his testimony that he negotiated with Thomas and agreed to reduce the original $38,721,426.00 purchase price listed in Greensboro's proforma (Exhibit 26) for Signature Place to $37 million, in exchange for Thomas's agreement that DBSI would pay for the GOC tenant upfit, was not credible.  Tr. Vol. 2, pp. 78-79; p. 111, Ls. 11-14 (Sullivan's testimony that he and Thomas specifically agreed that DBSI would pay for GOC's tenant improvements); p. 182, Ls. 9-19; p. 206, Ls. 10-16; p. 207, Ls. 8-21; p. 208, Ls. 1-10 (review of Sullivan's deposition testimony); p. 216, Ls. 1-4; Tr. Vol. 3, p. 9, Ls. 7-14.

Although no DBSI employee testified in direct contradiction to Sullivan's testimony, the Court finds it is not credible for several reasons.  First, Sullivan's verified interrogatory responses do not state he had any conversations with Thomas about the GOC tenant upfit allowance.  Tr. Vol. 2, p. 172, Ls. 14-25; p. 173, Ls. 3-8; Exhibit IIII.  The interrogatory requested identification of all oral communications occurring between DBSI employees and Greensboro.  Exhibit IIII, p. 6.  Although the answer includes an objection, it also states:

---

[7]  Neither party called Thomas as a witness.  Thomas left DBSI in April of 2005 after a conflict of interest arose from work conducted on business of his own while employed by DBSI. Tr. Vol. 3, p. 84, Ls. 8-21.  Litigation between DBSI and Thomas occurred as a result of this conflict and Thomas was required to pay DBSI a certain sum and to provide an apology to DBSI employees for his actions.  Tr. Vol. 3, p. 84, L. 20 - p. 85, L. 5.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 6**

"Sullivan had numerous conversations with individuals of DBSI . . ., in particular Eric Gordon, concerning the purchase and sale of the Signature Place property.  In none of these conversations, however, did Mr. Sullivan discuss the payment of the Tenant Upfit Allowance." *Id.*

Second, Thomas's demand letter for reimbursement of the GOC upfit expense did not mention an agreement that DBSI would pay for the allowance.  Exhibit 30; Tr. Vol. 2, p. 174, Ls. 9-19.  Third, nothing in the letter from Greensboro's attorney, Jeff Harrison ("Harrison"), to Thomas on January 14, 2005 specifically asserts or even indicates that Sullivan had an agreement with Thomas or DBSI for DBSI to pay the GOC tenant upfit allowance.  Tr. Vol. 3, p. 12, Ls. 11-22; Exhibit DDD.  Fourth, Sullivan did not inform Harrison about his agreement with Thomas for DBSI to pay the approximate $1.2 million GOC tenant improvement.  Tr. Vol. 3, p. 48, Ls. 17-21.  Finally, although Sullivan's deposition testimony, the transcript of which was published at the trial, included statements that Sullivan had told Thomas in May or June of 2004 that DBSI would be responsible for the GOC tenant upfit, he did not state that this was in exchange for an agreement by Sullivan to reduce the Signature Place purchase price even though Sullivan was asked to relate everything he could remember about his conversation with Thomas and what agreements had been made in May or June of 2004.  *See* Sullivan Deposition Tr., pp. 35-40.

Accordingly, for these reasons, and based on the specific Findings outlined below, there is not enough reliable evidence to find and conclude that Sullivan and Thomas reached an agreement to reduce the original $38,721,426 purchase price listed in Greensboro's proforma

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 7**

(Exhibit 26) for Signature Place to $37 million based on Thomas's alleged agreement that DBSI would pay for the GOC tenant upfits.

In addition, there is not sufficient evidence for the Court to find and thus conclude that Greensboro or Sullivan agreed as a contractual matter, or otherwise represented, that Greensboro would pay for the upfit allowances.  Sullivan did not specifically state to DBSI employee Eric Gordon ("Gordon") that Greensboro would pay for the tenant upfits; instead, Gordon merely got this impression from their conversations and an email forwarded to Gordon on July 27, 2004. Tr. Vol. 1, pp. 162-63; Exhibit 19.  The email contained no new text, it simply included a message sent on June 11, 2004 from Sullivan to Mike Thomas that stated, in relevant part, "we've been told that the new tenant (Greensboro Orthopaedic) is going to spend at least an additional $15 sf ($450,000) for TI over our allowance."  Exhibit 19.

Gordon testified that his "understanding" from this email was "Sullivan informing [him] that [GOC] was going to spend an additional $450,000 over the TI allowance that [Sullivan] allotted to them," Tr. Vol. 1, p. 169, Ls. 7-10, and stated that Sullivan assured him there were "no additional costs or expenses" that Gordon did not have in his financial analysis.  Gordon also testified that in his conversations with Sullivan it was "confirmed" there was nothing else Gordon needed to include.  Tr. Vol. 1, p. 176, Ls. 5-9; Vol. 2, p.24, Ls.18-25; p. 24, Ls.1-3. However, Gordon could not recollect that Sullivan "specifically said [Greensboro] would pay for the GOC [upfit]," Tr. Vol. 2, p. 57, Ls. 17-19, and Sullivan testified that he did not make any representation to Gordon that Greensboro would pay for the GOC and TRC tenant upfit allowances, Tr. Vol. 2, p. 109, L.8 - p. 110, L. 1.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 8**

Moreover, although Sullivan testified at trial that a different reason supported his sending the email to Gordon than he originally asserted in his deposition testimony, *compare* Tr. Vol. 2, p. 189, Ls. 1-4 *with* Tr. Vol. 2, p. 186, L. 7- p. 187, L. 25; Tr. p. 189, L. 21 - p. 190, L. 4, the evidence that Sullivan may have forwarded the email to Gordon to mislead him is too tenuous to meet the preponderance of the evidence standard, especially where the emails were written before the Closing date when the GOC Upfit Allowance was still Greensboro's responsibility, Tr. Vol. 1, p. 170, Ls. 19-24 (Gordon testimony); Tr. Vol 2, p. 16, Ls. 10-16; Tr. Vol. 1, p. 117, L. 5 - p. 188 L. 12 (McMurray testimony); Tr. Vol. 2, p. 96, Ls. 15-22 (Sullivan testimony), and Thomas McMurray ("McMurray"), the property manager of Greensboro Place for Greensboro and now for DBSI, Tr. Vol. 1, p. 83; p. 84, Ls. 14-24, testified he never heard Sullivan say anything to DBSI that he thought was false or misleading, Tr. Vol. 1, p. 101, Ls. 8-14; p. 103; p. 94, Ls. 2-7; p. 119, Ls. 14-22.

Considered in this light, there is insufficient evidence to find that Sullivan made false representations in the June 11 or July 27, 2004 emails sent to DBSI representatives, or that he made any false representations during a telephone conversation with Gordon.

Further, considering the evidence and testimony at trial, the tenant estoppel certificates do not provide a sufficient basis to support Plaintiff's claims.  Significantly, the certificates were reviewed and signed by representatives of the Signature Place tenants and the certificates included an acknowledgment by these representatives that both DBSI and Greensboro "are relying (and will rely) on the truth and accuracy of the representations" made in the certificates. Exhibit 17, p. 2; Exhibit 16, p. 2.  Accordingly, it cannot be fairly stated that Greensboro or Sullivan represented anything in those certificates.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 9**

The relevant provision in the estoppel certificates, Paragraph 5, states: "There is no existing offset or defense to the payment of rent and other charges payable by Tenant or otherwise to enforcement of the Lease, and tenant asserts no claim against Landlord in regard to any obligation of Landlord relating to the Premises."  Exhibit 17, p. 1, ¶ 5; Exhibit 16, p. 1, ¶ 5. Neither Sullivan nor McMurray thought this paragraph applied to the tenant upfit allowances. Tr. Vol. 1, p. 121, L. 22 - p. 123, L. 6.  Sullivan understood the section to mean that "there's no default under the lease, and [it is] in full force and effect."  Tr. Vol. 2, p. 101, Ls. 16-19. McMurray did not think the tenant estoppel certificates were misleading, nor did Sullivan ever ask McMurray to mislead DBSI about anything or even suggest that McMurray mislead anyone. Tr. Vol. 1, p. 101, Ls. 8-14; p. 103; p. 94, Ls. 2-7; p. 119, Ls. 14-22.

Considering that the parties agreed to the form of the estoppel certificates, the tenant representatives reviewed and signed the certificates, and in light of the understanding of Paragraph 5 as testified to by Sullivan and McMurray, the word "claim" in Paragraph 5 does not include a representation as to tenant upfit allowance payments, the right to which had not yet accrued when the tenant representatives signed the certificates.

Additionally, although there was a mistake in the TRC certificate's report of no prepaid rent when $2,428.13 had been prepaid, TRC's controller testified that it "was an oversight on [his] part, since [he] was the one who reviewed the estoppel certificate."  Deposition of Craig Kumpf[8], p. 24, L. 12 - p. 25, L. 5.  The testimony of McMurray confirms that the exclusion of prepaid rent was in fact a mistake.  Tr. Vol. 1, pp. 95-106.  This mistake is not the responsibility

---

[8]  Craig Kumpf's deposition testimony was read into the record at trial.  *See* Tr. Vol. 1, p. 131.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 10**

or fault of Greensboro and does not provide a basis for any of Plaintiff's claims.  Finally, these facts demonstrate that Sullivan, McMurray, and Greensboro used "reasonable effort" to obtain the required certificates.

Accordingly, there is not sufficient evidence in the record to establish fraud, a breach of the covenant of good faith and fair dealing, or a consumer protection claim against Defendants; rather, the written contractual terms and the parties' intent with respect to those terms control the outcome of this action.

Gordon was not involved in the contract negotiations, so his intent with respect to the obligations DBSI was assuming in the Contract and at Closing has not been relied on in determining the parties' intent under the Contract, particularly because there is testimony of the parties' intent provided by those involved in drafting the Contract.  The Court's interpretation of the Contract terms is based upon the testimony provided by those actually involved in negotiating and drafting the Contract, i.e., Kristin Dunn ("Dunn"), DBSI's attorney, Jeff Harrison, Greensboro's attorney, and Sullivan, the principle negotiator for Greensboro.

The Court finds that the parties agreed DBSI would assume all of the leases and the obligations and benefits thereunder.  With respect to the tenant upfits, the Contract "clearly provided that the purchaser would be assuming . . . those sorts of obligations with respect to the leases that have been signed prior to . . . execution of the contract."  Tr. Vol. 3, p. 33, Ls. 6-16 (Harrison testimony).[9]  The plain language of the Assumption executed at Closing reflects this

_____

[9]  Some of the trial testimony focused on the fact that an upfit allowance for tenant Novartis's improvements was credited to DBSI at Closing, Exhibit 27, but the GOC and TRC upfits were not similarly treated.  The Contract also specifically addressed the Novartis lease by providing that this lease "is hereby deemed approved by Purchaser, provided, Seller hereby

(continued...)

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 11**

was the parties' intent.  Exhibit 1 at Ex. D (Assumption attachment to Contract stating that DBSI

"agrees to perform all of the obligations of [Greensboro] under the Leases after the date of this

Assignment").  The testimony of Harrison confirms this was the parties' intent.  Tr. Vol. 3, p. 34,

Ls. 17- 22; p. 36, Ls. 18-24 (testimony that Harrison and Dunn agreed to the contents of the

Assumption and it was the parties' intent that DBSI would assume all obligations of the leases);

*see also* p. 59, L. 13 - p. 60, L. 9.

---

[9](...continued)
agrees to be responsible for any tenant improvement costs."  Exhibit 1, § 4.4.
  The Court adopts the representation of Sullivan and Harrison explaining why the
Novartis lease was treated differently, and finds it does not bear on whether DBSI agreed to
assume responsibility for payment of the TRC and GOC upfits.  Sullivan explained the Novartis
upfits were handled differently because the Novartis lease was being negotiated at a time when
the Contract was just about to be signed, whereas the GOC and TRC leases were entered into (on
June 2, 2004, and January 16, 2004, respectively,) before negotiations about the Contract's terms
commenced.  Tr. Vol. 2, pp. 104-5; p. 155, Ls. 2-9; pp. 159-60; p. 184, Ls. 1-4; p. 214
(Sullivan's testimony stating that the Novartis tenant improvements were specifically addressed
so that Defendants would not have to obtain DBSI's approval for the lease that was signed just a
few days before the contract was signed).  The Novartis lease was signed on July 6, 2004, just
two days before the final version of the Contract, which had gone through several revisions, was
signed.
  Harrison's testimony confirms that Novartis lease was treated differently.  Harrison
stated that Dunn told him DBSI had approved the Novartis lease subject to Greensboro's
agreement to pay for the tenant improvement costs associated with that lease.  Tr. Vol. 3, p. 37,
Ls. 1-25; *see also* Tr. Vol. 3, p. 35, L. 22 - p. 36, L. 17; Tr. Vol. 2, p. 216, Ls. 10-19; Exhibit VV
(Sullivan's email to Gordon to inform him of the Novartis lease and the credit that would be
reflected on the closing statement).
  In sum, the Novartis lease was specifically provided for because it was being negotiated
at the same time the Contract was going through rewrites and when the Novartis lease and/or the
Contract would be signed was "anyone's best guess."  Tr. Vol. 3, pp. 44-45 (Harrison
testimony).  At the time the Novartis lease was put into the Contract papers, the lease was not
signed, Tr. Vol. 3, p. 46, Ls. 8-12, even if it ultimately was signed before the Contract was
executed.  Moreover, the fact that the parties specifically provided for this lease and payment of
the tenant upfits in the Contract and Closing documents suggests that DBSI was aware that
tenant upfits, in general, were being undertaken in the building and that if certain upfits were to
be excluded from the Assumption, the parties had a method for providing for such exclusions in
the Contract and by crediting DBSI at Closing.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 12**

The testimony of DBSI's attorney is neither inconsistent nor contradictory. Dunn testified she had no recollection of discussing with DBSI its responsibility for obligations under preexisting leases, Tr. Vol. 3, p. 72, Ls. 22-25, but that she would have spoken with DBSI about what the assumption term meant and what DBSI was agreeing to do as part of the transaction. Tr. Vol. 3, p. 79, Ls. 1-18. Dunn did not read the tenant leases before recommending that DBSI assume the obligations in those leases. Tr. Vol. 3, p. 81, Ls. 5-14; p. 82, Ls. 15-22. Dunn stated that she would have communicated information about what the assumption term meant to Rhonda Garland, *id.* at Ls. 19-23, or Mike Thomas, Tr. Vol. 3, p. 80, Ls. 2-5, and she would have forwarded the drafts of the contract to them, but would not have gone through the contract line by line, Tr. Vol. 3, p. 80, L. 14 - p. 81, L. 4. Neither Rhonda Garland nor Mike Thomas provided testimony at trial.

One obligation of both the GOC and TRC leases was for payment of a tenant upfit allowance upon completion of certain conditions. Those conditions for payment, and thus the obligation to pay, occurred after Closing, the date on which DBSI assumed all obligations under the leases. For this reason, and because the Court finds that none of the Defendants represented that Greensboro would pay the upfit allowances nor did Greensboro or Sullivan warrant that no work had been done on the property by anyone that had not been paid, DBSI is responsible for payment of the tenant upfit allowances.

In making this determination, the Court finds credible Harrison's testimony that he made it clear in contract negotiations with Dunn that Greensboro's Section 9.4(e) representation would apply only if labor or material had been provided to the seller, i.e., Greensboro, and that Dunn agreed. Tr. Vol. 3, p. 24, L. 22- p. 25, L. 25; *see also* p. 55, Ls. 9-15; Exhibit S, § 9.4(d).

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 13**

Section 9.4(e) provides: "No labor has been performed, nor materials supplied to Seller for the Property which the Seller has not fully paid."  As the Court determined in the May 9, 2006 summary judgment ruling, Section 9.4(e) is ambiguous and subject to more than one interpretation; thus, the intent of the parties is critical to determining what Greensboro warranted in that section.  The interpretation offered by Greensboro, and supported by Harrison's testimony, is that section 9.4(e) warrants only that no labor has been performed nor materials supplied "to Seller for the Property" for which the Seller has not fully paid.

Plaintiff's opposing interpretation is not supported by the evidence introduced at trial. Although Dunn, the attorney for DBSI who negotiated this provision, did not remember any discussions with Harrison that would be inconsistent with interpreting 9.4(e) to warrant (as Plaintiff's argue) that no materials had been supplied for the property nor work performed for the property, which had not been paid, Tr. Vol. 3, p. 75, Ls.11-25, she also did not recall any specific discussion with Harrison about the scope of section 9.4(e), Tr. Vol. 3, p. 74, Ls. 6-23. Additionally, Dunn did not testify that her intent or that of DBSI in negotiating this provision was to have a representation that no labor had been performed on the property for any tenant or materials supplied to any tenant on the property.

As an additional consideration, Sullivan credibly testified that the contractual representation of no work performed or materials provided was meant to apply only to the seller, Greensboro, and not to everyone in the building because, in a 300,000 square foot office building, there are many types of work being performed in the tenant's spaces.  Tr. Vol. 2, pp. 108-09.  Harrison confirmed that the provision as proposed by DBSI's attorney would have potentially covered work done by anybody with respect to the property and Harrison did not

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 14**

think Greensboro could rightly make a representation in that regard because there are many tenants in the building that may be doing work at any given time.  Tr. Vol. 3, p. 22, Ls. 14-24.

Moreover, Sullivan testified that when he signed the contract no labor or materials had been provided to seller that had not been fully paid, Tr. Vol. 2, p. 110, and that it was not his intent to represent that the work for GOC and TRC tenant upfits had been paid, *id.* at p. 111. Thus, the weight of the evidence on the intent of the representation contained in Section 9.4(e) favors Greensboro's interpretation of the section and Plaintiff has not established a breach of contract or a breach of the covenant of good faith and fair dealing in relation to Section 9.4(e).

Significantly, the due diligence process should have provided the information necessary for DBSI to know it was assuming the obligation to pay the tenant upfit allowances.  Eric Gordon and Lori Moody with DBSI worked on the due diligence together because "it was decided it would help the process be more efficient and effective if Lori Moody would review the leases and [Gordon] would work on the financial analysis of it, and then [they] would work together on putting together the rent roll."  Tr. Vol. 1, p. 159, L.25 - p.160, L. 5.  Moody "was actually reading and abstracting the leases to pull from them the pertinent information that [DBSI] needed to put in [their] rent roll," Tr. Vol. 1, p. 159, Ls. 10-13, but she never spoke with Gordon about the tenant upfit allowances.  Tr. Vol. 2, p. 34, Ls. 19-24 (Gordon testimony).  A list of lease questions prepared by Moody during the due diligence process, and discussed by Gordon and Sullivan, did not include any questions about the TRC or GOC tenant upfits.  *See* Exhibits HH & MM.  In fact, Gordon does not remember anyone at DBSI ever speaking with him about the upfit allowances.  Tr. Vol. 2, p. 35, Ls. 2-3.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 15**

Despite the information on the tenant upfit allowances provided to DBSI by way of the TRC and GOC leases, and the DBSI employees' on-site visits to the property where the GOC upfits were under construction, Gordon, who verified the financial data for DBSI as a part of the due diligence process, testified he did not know DBSI was assuming tenant upfit obligations. However, Gordon never read or reviewed the tenant leases, and he only looked at parts of the Contract.  Tr. Vol. 1, p. 154, Ls. 5-13; p. 155, Ls. 4-6; p. 157, Ls. 17-21; p. 159, Ls. 19-22; p.160, Ls. 19-20; (Gordon testimony).  The Contract required DBSI to "conduct investigations of the property" and provided that "Purchaser shall not have a right to bring any action against Seller for breach of a representation or warranty in any circumstance where Purchaser had actual knowledge prior to Closing that such representation or warranty was inaccurate if Purchaser failed to notify Seller of such fact in writing prior to the Closing."  Exhibit 1, §§ 6.3, 9.4(h)(iii); Tr. Vol. 3, p. 37, L. 18 - p. 39, L. 22 (Harrison testimony).  Collectively, DBSI had access to all of the information it needed to know that it was assuming the tenant upfit obligations, even if no one employee reviewed all of the information gathered during the due diligence process.

**B.     Defendant Greensboro's Counterclaim**

For reasons set forth in more detail below, according to the Contract terms and industry standards, DBSI is required to reimburse Greensboro for a portion of the operating expenses collected as pass-throughs from the tenants for the year 2004.  Although the contract may not address the method for prorating the operating expenses, that does not mean the Contract did not contemplate reimbursement to Greensboro for a portion of the expenses.

The Court has relied on Harrison's testimony that it is customary in the real estate industry for prorations of operating expenses to be made after a closing, and for collections of

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 16**

taxes and operating expenses to be distributed to the previous owner based on the length of time of ownership of the real property.  Tr. Vol. 3, p. 28 Ls. 11-25 (Harrison testimony); Tr. Vol. 2, p. 113, L. 3 - p. 114, L. 2 (Sullivan testimony).  Section 8.4 is a clause that is customary in the real estate industry to indicate the obligation to prorate such operating expenses.  *See id.*

By way of explanation, Mike Attiani with DBSI testified about industry standards, but his testimony is not inconsistent with Harrison's testimony.  Attiani explained that the standard for whether amounts would be due to a seller in a full-service lease situation takes into account that pieces of a base year are not allocated evenly day by day, so what a tenant owes on a given day, prorata, for their base year, cannot be calculated at any point in time during a year.  Tr. Vol. 3, p. 97, L. 20 - p. 99, L. 21.  He explained that expenses are not incurred on an even, specific basis.  Tr. Vol. 3, p. 99, Ls. 3-5.  For example, snow removal expenses occur only at certain times during the year and utility expenses are generally higher during the summer months.  Tr. Vol. 3, p. 99, Ls. 11-18.  Thus, the industry standard is to calculate operating expense on a twelve-month period.  Tr. Vol. 3, p. 99, Ls. 19-21 (Attiani testimony).

Attiani also testified that it would break with industry standards to calculate what is owing to Greensboro under Section 8.4 by taking three-fourths of the approximately $138,000 collected by DBSI simply because Greensboro owned the building for three-fourths of 2004.  Tr. Vol. 3, p. 110, Ls. 1-11.  However, Attiani later clarified that he was familiar with industry standards on *calculating operating expenses*, that he does not believe there is an industry standard on the custom *for prorata recoupment and repayment to seller* by a buyer for operating expenses, Tr. Vol. 3, p. 110, L. 22- p. 111, L. 9, and that the terms of the entire contract control

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 17**

whether and how recoupment by the seller of these expenses is to be made, Tr. Vol. 3, p. 111, Ls. 4-9 (emphasis added).

As a property manager for approximately 240 DBSI buildings, Attiani testified that each contract is unique, but it is typical to do some sort of reconciliation with a seller on prepaid and post-paid expenses.  Tr. Vol. 3, p. 97, Ls. 8-19.  He also testified that he came to the conclusion no money was owed to Greensboro under section 8.4(a) because the expenses incurred by Greensboro up through September 30, 2004, did not meet any of the thresholds for the base year in the tenant leases.  Tr. Vol. 3, p. 86, Ls. 6-16.  That is, the expenses expended by the seller were less than every tenant's base year and, therefore, no base year was exceeded.  Tr., Vol. 3, p. 94, Ls. 17-25.  Attiani testified that section 8.4(b) was ambiguous to DBSI employees because it is inconsistent with 8.4(a).  Tr. Vol. 3, p. 101, Ls. 3-15; p. 109, Ls. 17-21.  Attiani was not involved in contract negotiations though, so his interpretation of section 8.4 is not an expression of the parties' intent at the time they entered the Contract.

In contrast, Harrison, who was involved in the contract negotiations and drafting, testified that Section 8.4 means that "the seller is supposed to be responsible for and obtain the benefits of the property up to the date of Closing, and the purchaser is supposed to be responsible for the obligations and receive the benefits of things that accrue after closing."  Tr. Vol. 3, p. 29, Ls. 4-9.  Harrison testified that if pass-throughs and operating expenses were owing to the seller at Closing and they were ultimately collected by purchaser, they should be paid to the seller.  Tr. Vol. 3, pp. 31-32; *see also* Tr. Vol. 3, p. 28, Ls. 14-22 (Harrison's testimony that he sees proration provisions in all of his real estate sales transactions).  Dunn did not remember having

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 18**

any substantive conversation with Harrison about any of the section 8.4 provisions.  Tr. Vol. 3, p. 73, Ls. 11-14.

Based on Harrison's testimony, and because DBSI at Closing received a credit for taxes prorated based on Greensboro's nine-month ownership of Signature Place, Tr., Vol. 2, p. 118, Ls. 22-24 (Sullivan testimony); Exhibit E (Closing Statement); Tr. Vol. 3, p. 105, Ls. 17-21 (Attiani testimony), it is appropriate to prorate the operating expenses based on the nine-month ownership formula.  This methodology is supported by the email of DBSI employee Marcie Brock, who wrote on October 4, 2004 that "we are to reconcile the full year 2004 expenses.  We then need to remit Jan – Sept recaptured expense to the former owner."  Exhibit QQQ; *see also* Tr. Vol. 3, p. 93, Ls. 3-11 (explaining that it was not possible for DBSI  to do an analysis of the reimbursements until towards the end of the first quarter of the year 2005, after all of the expenses/charges for December came in).

These reasons support awarding Greensboro $103,497.92 on its counterclaim against DBSI for breach of contract.

## III.

## LEGAL AUTHORITY

The parties agree that North Carolina law applies to the parties' breach of contract claims and that Idaho law applies to Plaintiff's fraud and unfair and deceptive acts claims.  *See* Docket No. 80, Att. 1; Docket No. 93.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 19**

**A.     Contract Claims**

Where a contract is ambiguous, other relevant and material extrinsic evidence should be considered to ascertain the parties' intent for the contract.  *See Lagies v. Myers*, 542 S.E. 2d 336, 342 (N.C. Ct. App. 2001).  Such extrinsic evidence may include evidence of an industry custom and usage to ascertain the parties' intent.  *See Peaseley v. Virginia Iron, Coal, Coke Co.*, 194 S.E.2d 133, 142 (N.C. 1973).  Additionally, "a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement."  *Maglione v. Aegis Family Health Ctrs.*, 607 S.E.2d 286, 291 (N.C. Ct. App. 2005) (quoting *Weyerhaeuser Co. v. Bldg. Supply Co.*, 253 S.E.2d 625, 627 (N.C. 1979)).

**B.     Fraud Claim**

To make a claim for fraud there must be evidence of (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) the hearer's reliance on the truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury.  *Aspiazu v. Mortimer*, 139 Idaho 548, 550, 82 P.3d 830, 832 (2003).

**C.     Idaho Consumer Protection Act**

The Idaho Consumer Protection Act makes unlawful certain "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . where a person knows or in the exercise of due care should know, that he has in the past, or is [engaging in prohibited conduct]."  Idaho Code § 48-603.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 20**

# IV.

## FINDINGS OF FACT

Having carefully considered the testimony of the witnesses called at trial, thoroughly reviewed the exhibits admitted into evidence, and considered the parties' arguments, the Court makes and enters the following Findings of Fact pursuant to Federal Rule of Civil Procedure 52(a).  All Findings of Fact referred to herein, unless otherwise qualified or limited, apply the preponderance of the evidence standard.  To the extent that any conclusions of law contained herein can be considered to be or are deemed to be findings of fact, they are incorporated by reference into these Findings of Fact.

Additionally, to the extent the Court has concluded that any evidence in the record does not support certain claims or counterclaims made by the respective parties, it will not be included in these Findings of Fact or otherwise referenced.  The failure to mention an event or series of events in these Findings is not an oversight or unintentional omission but rather an indication that the evidence does not support a finding and/or conclusion in favor of the claim or counterclaim.  *See White Indus., Inc. v. Cessna Aircraft Co.*, 845 F.2d 1497, 1499 (8th Cir. 1988) (Rule 52(a) does not require particularized findings on each piece of evidence parties present at trial).  With these principles in mind, the Court's Findings of Fact are as follows:

A.     **The Contract**

1.     The letter of intent for DBSI's purchase of Signature Place, signed by both Mike Thomas, the vice-president of DBSI's acquisitions department, and Sullivan, stated that any representations and warranties would be contained in the final contract.  Exhibit Z; Tr. Vol. 2, p. 82, Ls. 11-17.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 21**

2.     On July 8 and 9, 2004, respectively, Greensboro and DBSI Housing signed the Contract for the purchase and sale of Signature Place.  Exhibit 1 (Contract).  The purchase price was $37,000,000.00.  *Id*. at p. 1, § 2.1.

3.     DBSI was given a minimum of twenty-five days for due diligence to review documents and make a physical inspection of the property.  *See id*. at p. 6, § 6.1.  (Stipulation).

3.     The closing for the purchase and sale of Signature Place occurred on September 30, 2004.  Exhibit E (Closing Statements).

4.     DBSI and Greensboro are equally sophisticated companies, whose principals have substantial experience in the real estate industry.  *See* Order, p. 7 (Docket No. 129); Tr. Vol. 1, p.27, Ls. 20-25; p. 28, Ls. 18-23; p. 30, Ls. 7-18 (Swenson testimony); Tr. Vol. 3, p. 17, L. 11 - p. 18, L. 11 (Harrison testimony); Tr. Vol. 3, p. 67, Ls. 21-25 (Dunn testimony).

5.     The final version of the Contract, including all attached exhibits, was drafted after extensive negotiations between the parties and their attorneys.  *See* Order, p. 5 (Docket No. 129; Exhibit T (contract negotiation correspondence); Tr. Vol. 3, p. 19, Ls. 4-8 (Harrison testimony); p. 71, Ls. 5-16 (Dunn testimony).

6.     Greensboro's principle, Mark Sullivan dealt primarily with Mike Thomas, the vice-president of DBSI's acquisitions department.  Tr. Vol. 2, p. 78, Ls. 17-20; Tr. Vol. 3, p. 84, Ls. 8-9.

7.     Eric Gordon, who performed due diligence for DBSI, was not involved in contract negotiations, Tr. Vol. 2, p. 27, Ls. 6-9, and he did not know what drove the price down from the $38,721,426 listed in Greensboro's proforma (Exhibit 26) to the $37 million that DBSI paid, Tr. Vol. 2, pp. 29-30.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 22**

8.    Although the base terms of the Contract were negotiated first between Sullivan and Thomas, Sullivan also negotiated the legal terms of the contract through the attorneys.  Tr. Vol. 2, p. 86, Ls. 11-17.

9.    Jeff Harrison, an attorney who has practiced law for twenty years and is board-certified in commercial real estate law, represented Greensboro in the contract negotiations, Tr. Vol. 3, p. 17, Ls. 11-25, and he was actively involved in the contract discussions and negotiations.  Tr. Vol. 3, p. 18, Ls. 17-20.  He negotiated with Kristin Dunn, an attorney for DBSI whose fifteen-plus years of practice has focused primarily on commercial real estate transactions.  Tr. Vol. 3, p. 18, Ls. 21-24; p. 67, L. 15- p. 68, L. 6.  Both parties had the representation of equally skilled and able legal counsel in the transaction at issue here.

10.    Sullivan's testimony that he told Thomas the price could be $37 million if DBSI would pay for the GOC tenant upfit and they negotiated that issue is not credible.  See Tr. Vol. 2, pp. 78-79; p. 111, Ls. 11-14 (Sullivan's testimony that he and Thomas specifically agreed that DBSI would pay for the tenant improvements of GOC); p. 182, Ls. 9-19; p. 206, Ls. 10-16; p. 207, Ls. 8-21; p. 208, Ls. 1-10 (review of Sullivan's deposition testimony); p. 216, Ls. 1-4; Tr. Vol. 3, p. 9, Ls. 7-14; Tr. Vol. 2, p. 172, Ls. 14-25; p. 173, Ls. 3-8; Exhibit 30; Tr. Vol. 2, p. 174, Ls. 9-19.; Tr. Vol. 3, p. 12, Ls. 11-22; Exhibit DDD; Tr. Vol. 3, p. 48, Ls. 17-21.

10.    Sullivan's testimony that he negotiated with Thomas for DBSI's assumption of the tenant leases and the obligations contained therein is credible, is reflected in the Contract language, and is supported by the testimony of Harrison.  Tr. Vol. 2, p. 97, Ls. 14-22.

11.    The Assumption executed at Closing provides:

> Assignee [DBSI] hereby assumes, and agrees to perform all of the
> obligations of Assignor [Greensboro] under the Leases after the

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 23**

> date of this Assignment, and assumes and agrees to pay any
> leasing commissions that become payable after the date of this
> Assignment with respect to any of the Leases . . . .

Exhibit 1 at Ex. D, p. 2; *see also* Exhibit 1, §§ 8.2(c), 8.3(b) (requiring the parties at Closing to

enter into the Assumption).

12.     The plain language of the Assumption reflects the parties' intent for DBSI "to

perform all of the obligations of [Greensboro] under the Leases after the date of this

Assignment," Exhibit 1 at Ex. D, and the testimony of Harrison confirms this was the parties'

intent, Tr. Vol. 3, p. 34, Ls. 17- 22; p. 36, Ls. 18-24 (testimony that Harrison and Dunn agreed to

the contents of the Assumption and it was the parties' intent that DBSI would assume all

obligations of the leases); *see also* p. 59, L. 13 - p. 60, L. 9; Tr. Vol. 3, p. 33, Ls. 6-16 (Harrison

testimony).

13.     Even if Plaintiff assumed the obligation to pay the upfit allowances, it may still be

able to recover the amounts paid if it can establish that Defendants breached Section 9.4(e) of the

Contract and that this breach caused damages in the amount of the upfit allowances and

associated costs.  *See* Order, pp. 21-22 (Docket No. 110).

14.     Section 9.4(e) of the Contract provides:  "Liens.  No labor has been performed, nor

materials supplied to Seller for the Property which the Seller has not fully paid."  Exhibit 1.  The

Court previously determined that the language in 9.4(e) is ambiguous, the differing

interpretations offered by the parties are both reasonable, and interpretation of the contract is for

the trier-of-fact.  Order, p. 19 (Docket No. 110).

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 24**

15.    Dunn proposed language for this section that was much broader than the provision included in the final Contract.  Tr. Vol. 3, p. 20, L. 23 - p. 25, L. 4.  Dunn's proposed version stated: "No labor has been performed, nor materials supplied for the property which the seller has not fully paid or for which mechanic's liens or materialmen's liens or other liens may be claimed by any person or entity."  Tr. Vol. 3, p. 23, Ls. 1-5; Exhibit S.  Through negotiations with Harrison in the context of possible lien claims, Tr. Vol. 3, p. 26, Ls.16-2, the provision was carved down to provide that only work and materials *provided to the seller* were warranted.  Tr. Vol. 3, p. 22, Ls. 5-8; p. 24, Ls. 7-25 (Harrison testimony) (emphasis added).

16.    Harrison eliminated the final clause of Dunn's proposed revision relating to liens by mechanics and materialmen so that the provision would be "specifically tied to the seller's action and to the property."  Tr. Vol. 3, p. 24, Ls. 14-21; Exhibit S, § 9.4(d).

17.    Harrison's testimony is credible that he made it clear in contract negotiations with Dunn that Greensboro's 9.4(e) representation would apply only if labor or material had been provided to the seller, i.e., Greensboro, and that Dunn agreed.  Tr. Vol. 3, p. 24, L. 22- p. 25, L. 25; *see also* p. 55, Ls. 9-15.

18.    Greensboro's contractual representation of no work performed or materials provided was meant to apply only to the seller, Greensboro, and not to everyone in the building.  Tr. Vol. 2, pp. 108-11 (Sullivan testimony); Tr. Vol. 3, p. 22, Ls. 14-24 (Harrison testimony).

19.    The weight of the evidence on the intent of the representation contained in Section 9.4(e) favors Greensboro's interpretation.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 25**

B.    **The Tenant UpFit Allowances**

20.    When a landlord will reimburse for tenant upfits is something typically negotiated between the landlord and tenant.  Tr. Vol. 1, p. 70, Ls. 22-25.  The payment obligations for the TRC and GOC tenant upfits were provided for in their respective leases with Greensboro.

21.    On January 16, 2004, Greensboro and TRC signed a five and one-half year office lease ("TRC Lease"), wherein Greensboro leased approximately 1,575 square feet in Signature Place to TRC.  Exhibit 13, p. 1 (TRC Lease).  Included in the TRC Lease was a $9.00 per square foot allowance for tenant improvements, for a total allowance of $14,175.00 ("TRC Upfit Allowance").  *See id.*, Art. XX in "Rider to Office Lease."

22.    The TRC Upfit Allowance was to be paid upon completion of the tenant improvements, issuance of a certificate of occupancy, and contractor's waiver of lien.  *See id.* (Stipulation).

23.    TRC received a certificate of occupancy as of April 14, 2004, Exhibit 5, p. 7; Tr. Vol. 1, pp. 88-89 (McMurray testimony), and used the premises as office space starting at approximately that same time.  Tr. Vol. p. 89, L. 3 - p. 90, L. 9.

24.    TRC did not receive a waiver of lien until January 21, 2005, after DBSI assumed all of the obligations of the TRC lease at the September 30, 2004 Closing.  Exhibit 5 (Waiver of Liens to TRC).  On February 25, 2005, TRC requested that DBSI pay the TRC Upfit Allowance. (Stipulation).

25.    On June 2, 2004, Greensboro and GOC signed a ten year office lease ("GOC Lease"), wherein Greensboro leased approximately 30,518 square feet in Signature Place to GOC.  *See* Exhibit 14, p. 5 (GOC Lease).  The GOC Lease specified a $40.00 per square foot

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 26**

allowance for tenant improvements, for a total allowance of $1,220,712.00 ("GOC Upfit

Allowance").  *See id.*, Art. XXI in "Rider to Office Lease."

     26.    The GOC Upfit Allowance was to be paid upon completion of the tenant

improvements and issuance of a certificate of occupancy.  *See id.*  (Stipulation).

     27.    GOC's tenant improvements were not completed by September 30, 2004, and GOC

did not receive a certificate of occupancy until November 18, 2004.  Exhibit K (Contractor's

Applications for Certificate of Payment to GOC); Exhibit 10 (Certificate of

Compliance/Occupancy for GOC; Tr. Vol. 1, pp. 91-92 (McMurray testimony); Release of Liens

to GOC (Ex. L); Deposition of James Ray Lomax, p. 6, ll. 19-25.

     28.    On December 1, 2004, GOC requested that DBSI pay the GOC Upfit Allowance.

Exhibit BBB (Letter from GOC).  (Stipulation).

**C.**    **Due Diligence & Contractual Warranties**

     29.    The Contract includes a provision proposed by Harrison that limits Greensboro's

representation as follows:

> Purchaser shall not have a right to bring any action against Seller
> for breach of a representation or warranty in any circumstance
> where Purchaser had actual knowledge prior to Closing that such
> representation or warranty was inaccurate if Purchaser failed to
> notify Seller of such fact in writing prior to the Closing.

Exhibit 1, p. 14, § 9.4(h)(iii); Tr. Vol. 3, p. 37, L. 18 - p. 39, L. 22 (Harrison testimony).

     30.    Section 6.3 of the Contract provides, in its entirety, as follows:

> EXCEPT AS OTHERWISE PROVIDED IN THIS CONTRACT
> TO THE CONTRARY AND THE WARRANTIES OF TITLE TO
> BE SET FORTH IN THE DEED, <u>SELLER IS NOT MAKING
> AND HAS NOT AT ANY TIME MADE ANY WARRANTIES
> OR REPRESENTATIONS OF ANY KIND OR CHARACTER,
> EXPRESS OR IMPLIED, WITH RESPECT TO THE</u>

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 27**

<u>PROPERTY</u>, INCLUDING, BUT NOT LIMITED TO, ANY
WARRANTIES OR REPRESENTATIONS AS TO
HABITABILITY, MERCHANTABILITY, FITNESS FOR A
PARTICULAR PURPOSE, TITLE ZONING, TAX
CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL
CONDITION, OPERATING HISTORY OR PROJECTIONS,
VALUATION, GOVERNMENTAL APPROVALS,
GOVERNMENTAL REGULATIONS, THE TRUTH,
ACCURACY OR COMPLETENESS OF THE ITEMS OR ANY
OTHER INFORMATION PROVIDED BY OR ON BEHALF OF
SELLER TO PURCHASER OR ANY OTHER MATTER OR
THING REGARDING THE PROPERTY.  UPON CLOSING,
SELLER SHALL SELL AND CONVEY TO PURCHASER AND
<u>PURCHASER SHALL ACCEPT THIS PROPERTY "AS IS,
WHERE IS, WITH ALL FAULTS."  PURCHASER HAS NOT
RELIED UPON AND WILL NOT RELY UPON EITHER
DIRECTLY OR INDIRECTLY, ANY REPRESENTATION OR
WARRANTY OF SELLER WITH RESPECT TO THE
PROPERTY.  PURCHASER WILL CONDUCT SUCH
INVESTIGATIONS OF THE PROPERTY, INCLUDING BUT
NOT LIMITED TO, THE PHYSICAL AND ENVIRONMENTAL
CONDITIONS THEREOF, AS PURCHASER DEEMS
NECESSARY TO SATISFY ITSELF AS TO THE CONDITION
OF THE PROPERTY AND WILL RELY SOLELY UPON SAME</u>
AND NOT UPON ANY INFORMATION PROVIDED BY OR
ON BEHALF OF SELLER.  THE DEED TO PURCHASER AT
CLOSING SHALL CONTAIN LANGUAGE SUBSTANTIALLY
SIMILAR TO THIS <u>SECTION 6.4</u>.

Exhibit 1, p. 7 (underlining emphases added).  *See also* Exhibit F, pp. 1-2 (Special Warranty

Deed).  (Stipulation).

31.    DBSI's President, Douglas Swenson, signed the Contract, but was not involved in

the due diligence process and never spoke to Sullivan or read the entire contract.  Tr. Vol. 1, pp.

54, 64.

32.    Eric Gordon and Lori Moody of DBSI worked on the due diligence together.  Tr.

Vol. 1, p. 159, L.25 - p.160, L. 4.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 28**

33.    Gordon started his due diligence analysis with a proforma provided by Sullivan (Exhibit 26), but he "would look to make sure these were accurate representations of the income and expenses, according to my review as well."  Tr. Vol. 1, p. 158, Ls. 9-16.; Exhibit 2.

34.    DBSI's acquisition department prepared its own proforma prior to closing.  Tr. Vol. 2, p. 31, Ls. 12-17.

35.    A proforma from a seller is a preliminary expression of a property's financial status, but not something to be relied upon in closing a $37 million dollar deal.  Tr. Vol. 2, p. 32, Ls. 6-10 (Gordon testimony); *see also* Tr. Vol. 2, p. 85, Ls. 9-25 (Sullivan testimony).

36.    One of the steps DBSI's due diligence department takes when it receives tenant leases is to determine if there are any unfinished and remaining tenant finish out obligations. Tr., Vol. 2, p. 33, Ls. 21-25 (Gordon testimony).

37.    One source for determining how tenant upfits being constructed during the time of due diligence, such as the GOC upfits, would be paid is to read the lease between the tenant and landlord.  Tr. Vol. 1, p. 81, Ls. 6-13 (Swenson testimony).

38.    Gordon never read or reviewed the tenant leases, and he only looked at parts of the Contract.  Tr. Vol. 1, p. 154, Ls. 5-13; p. 155, Ls. 4-6; p. 157, Ls. 17-21; p. 159, Ls. 19-22; p.160, Ls. 19-20; (Gordon testimony).  Moody read the tenant leases, Tr. Vol. 1, p. 159, Ls. 10-13, but neither she nor anyone at DBSI spoke with Gordon about the finish out allowances.  Tr. Vol. 2, p. 34, Ls. 19-24; p. 35, Ls. 2-3.

39.    Another method for determining whether upfits are being constructed is to conduct an on-site visit.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 29**

40.     Individuals from DBSI conducted on-site visits during the due diligence period.  Tr. Vol. 1, p. 114, Ls. 9-23; p.115, Ls. 13-19 (McMurray testimony); Tr. Vol. 2, p. 87, Ls. 11-25; p. 88, Ls. 3-7 (Sullivan testimony).

41.     Swenson expected DBSI employees during on-site visits to take note of tenant upfits and inquire about payment.  Tr.,Vol. 1, p. 70, Ls. 4-11; p. 71, Ls. 8-14 (Swenson testimony); *see also* Tr., Vol. 1, p. 116, Ls. 7-14 (McMurray testimony).

**D.     Tenant Estoppel Certificates**

41.     DBSI and Greensboro agreed to the form for the "Tenant Estoppel Certificates" as part of the Contract.  These certificates asked each tenant to acknowledge the lease; confirm its prepaid rent, security deposit, and monthly rent; and state whether there was any claim against Greensboro, as landlord, in regard to any obligation of Greensboro relating to the leased premises.  Tr. Vol. 2 p. 81, L. 11 - p. 82 L. 6; p.98, Ls. 9-14; Exhibit 1, at Ex. H.  (Stipulation).

42.     Closing was conditioned on DBSI's approval of the content of the estoppel certificates. Tr. Vol. 2, pp. 81-82; Exhibit Z, p. 2 (Letter of Intent) ("Closing is contingent on . . . Purchaser's approval of the content of all tenant estoppel certificates . . . .").

43.     The Contract included a provision whereby Greensboro agreed to "use reasonable effort to obtain the required Estoppel Certificate from such Tenant."  Exhibit 1, p.11, § 8.7.

44.     Sullivan provided Thomas McMurray with the form of the tenant estoppel certificate to be used and told him "[t]o fill out the estoppel for each tenant, fill in the blanks where required, with their addresses, lease date, square footages, make copies of the existing leases and amendments, if applicable, and attach them, get them to the tenants, have them sign them and get them back" to Sullivan, Tr. Vol. 1, p. 93, L. 25 – p. 95, L. 21 (McMurray testimony).

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 30**

45.     Paragraph 5 in the estoppel certificates states: "There is no existing offset or defense to the payment of rent and other charges payable by Tenant or otherwise to enforcement of the Lease, and tenant asserts no claim against Landlord in regard to any obligation of Landlord relating to the Premises.  There is no default under the Lease by Tenant, other than as follows: _____"  Exhibit 17, p. 1, ¶ 5; Exhibit 16, p. 1, ¶ 5.

46.     Neither Sullivan nor McMurray, the property manager of Greensboro Place for Greensboro and now for DBSI, Tr. Vol. 1, p. 83; p. 84, Ls. 14-24, thought this paragraph, or at least the last line of this paragraph, applied to the tenant upfit allowances.  Tr. Vol. 1, p. 121, L. 22 - p. 123, L. 21; *see also* Deposition of John Nosek[10], pp. 42-45.  Sullivan understood the section to mean that "there's no default under the lease, and it's in full force and effect."  Tr. Vol. 2, p. 101, Ls. 16-19.

47.     The word "claim" in Paragraph 5 does not include a representation as to tenant upfit allowance payments, the right to which had not yet accrued when the tenant representatives signed the estoppel certificates.

48.     The estoppel certificates contain the following statement:

> The undersigned acknowledges that [DBSI] and [Greensboro] are relying (and will rely) on the truth and accuracy of the representations made herein and upon the authority of the undersigned to execute this Estoppel Certificate on behalf of Tenant, in connection with Purchaser's acquisition of the Property (or Purchaser's decision not to purchase the Property).

Exhibit 17, p. 2 (GOC Tenant Estoppel Certificate) (emphasis added); Exhibit 16, p. 2 (TRC Tenant Estoppel Certificate).

---

[10] John Nosek's testimony was provided by videotaped deposition.  *See* Tr. Vol. 1, p. 147.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 31**

49.     The tenant representatives made this acknowledgment when executing the estoppels.

50.     The GOC Tenant Estoppel Certificate was signed by GOC's President, John P. Aplington.  Exhibit 17.  The TRC Tenant Estoppel Certificate was signed by TRC's Controller, Craig Kumpf.  Exhibit 16.  All information contained in the GOC and TRC estoppel certificates was confirmed by those tenants.  *See id.*; Exhibit 17; Deposition of Craig Kumpf, p. 25, L. 14; Deposition of John Nosek, p.53, Ls. 14-19.  GOC also relied on legal advice before signing the GOC Tenant Estoppel Certificate.  *See* Deposition of John Nosek, p. 38, L. 22 - p. 39, L. 1.

51.     Sullivan, on behalf of Greensboro, mailed the GOC Tenant Estoppel Certificate to DBSI on or about August 13, 2004, and the TRC Tenant Estoppel Certificate on or about August 11 and September 10, 2004.  *See* Exhibits 23, 24 and 25 (cover letters).

52.     Sullivan did not pay any attention to the specific language of the certificates in terms of the upfit allowances, Tr. Vol. 2, p. 101, Ls. 20-23; rather he looked at the forms to make sure they were filled out, but did not read them word for word, Tr. Vol. 2, p. 192, Ls. 11-21.

53.     Neither Sullivan nor Greensboro represented nor confirmed any fact in the estoppel certificates.  *See id.*; Tr. Vol. 1 p. 93 L. 25 - p. 95 L. 21; p. 103, L. 17 - p. 104, L. 16; p. 119 L. 23 - p. 120, L. 8 (McMurray testimony); Tr. Vol. 2, p. 98, L. 15 - p. 101, L. 1; p. 192, Ls. 5-21 (Sullivan testimony).

54.     Sullivan never suggested that the property manager, Thomas McMurray, should mislead DBSI in anything with respect to the transaction.  Tr. Vol. 1, p. 94, Ls. 2-7; p. 101, Ls. 8-14; p. 103 (McMurray's testimony about Sullivan's business practices and statement that he regards Sullivan as an honest man); p. 119, Ls. 14-22.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 32**

55.    Although there was a mistake in the TRC certificate's report of no prepaid rent when $2,428.13 had been prepaid, TRC's controller testified that it was TRC's mistake.  Deposition of Craig Kumpf, p. 24, L. 12 - p. 25, L. 5; Tr. Vol. 1, pp. 95-106.  *See also* Tr. Vol. 1, pp. 95, 105-06 (McMurray testimony).  This failure to list prepaid rent was not the responsibility or fault of Greensboro or Sullivan.

56.    Sullivan, McMurray, and Greensboro used "reasonable effort" to obtain the required certificates.

**E.    Sullivan's Alleged Representations and his Emails**

57.    Shortly before the end of the due diligence period, on July 27, 2004, Sullivan forwarded an email to Gordon.  Tr. Vol. 1, pp. 162-63; Exhibit 19.  The email contained no new text, it simply included a message sent on June 11, 2004 from Sullivan to Mike Thomas that stated, in relevant part, "we've been told that the new tenant (Greensboro Orthopaedic) is going to spend at least an additional $15 sf ($450,000) for TI over our allowance."  Exhibit 19.

58.    Sullivan's emails were written before the Closing date when the GOC Upfit Allowance was still Greensboro's responsibility.  *See* Tr. Vol. 1, p. 170, Ls. 19-24 (Gordon testimony); Tr. Vol 2, p. 16, Ls. 10-16; Tr. Vol. 1, p. 117, L. 5 - p. 188 L. 12 (McMurray testimony; Tr. Vol. 2, p. 96, Ls. 15-22 (Sullivan testimony).

59.    Considering all of these Findings, Sullivan made no false representations in the June 11 or July 27, 2004 emails that were sent to DBSI representatives.

60.    Gordon did not have a specific recollection of the exact words Sullivan used in their conversations, and could not recollect that Sullivan "specifically said the seller would pay" for the GOC upfit.  Tr. Vol. 2, p. 56, L. 22 - p. 57, L. 19.  Sullivan did not specifically state to

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 33**

Gordon or anyone at DBSI, or otherwise make any representation, that Greensboro would pay for the GOC and TRC tenant upfit allowances.  Tr. Vol. 1, pp. 95-106; Tr. Vol. 1, p. 176, Ls. 5-9; Vol. 2, p.24, Ls.18-25; p. 24, Ls.1-3; Tr. Vol. 2, p. 109, L.8 - p. 110, L. 1; Tr. Vol. 2, p. 57, Ls. 17-19.

61.    Sullivan made no false representations during any telephone conversation with Gordon that occurred between July 28 and August 2 of 2004 upon which DBSI had the right to rely.  Tr. Vol. 2, p. 109, L. 8 - p. 110, L. 1 (Sullivan testimony); Tr. Vol. 1, p. 177, Ls. 8-12 (Gordon testimony);Vol. 2, p. 56 L. 22- p. 57, L. 19.

**E.    2004 Operating Expense and Tax Prorations**

62.    The introduction to Section 8.4 states that "At Closing, the following items shall be adjusted or prorated between the Seller and Purchaser."  Exhibit 1, p. 10.  Section 8.4(a) of the Contract provides, in relevant part:

> Any rents or other charges subsequently collected by Purchaser which are owing to Seller by tenants or occupants of the Real Property for periods prior to the Closing Date shall be forthwith paid by Purchaser to Seller, including without limitation base escalation or pass-through collection of operating expense amounts.

*Id.*

63.    Section 8.4(b) states:

> Operating Expenses for the Property shall be prorated as of the Closing Date.  Purchaser shall send customary statements for reimbursement of operating expenses and taxes to tenants under the Leases after consulting with Seller with respect to the appropriate amounts due therefore, and shall remit to Seller, upon receipt, Seller's prorated share thereof.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 34**

64.   At the end of each year, the tenants of Signature Place pay a prorata share of the operating expense, taxes, insurance, cleaning, and utilities.  Tr. Vol. 2, p. 113, Ls. 13-23.

65.   In early 2005, DBSI collected $137,997.70 from the tenants for 2004 operating expenses and DBSI considered the actual expenses of $1,358,768 incurred by Greensboro when calculating each tenant's pro rata share for the year.  *See* Exhibits 38, 39; Tr. Vol. 3 p 93, L. 12 - p. 94, L. 15; p. 107, L. 18 - p. 108, L. 16; Tr. Vol. 2, p. 126, Ls. 12-23 (Sullivan testimony); Tr. Vol. 3, p. 108, Ls. 2-8.

66.   The expenses paid by Greensboro include real estate property taxes paid through September 30, 2004 of $246.751.11, an amount credited to DBSI at Closing.  Exhibit E (Closing Statement); Exhibit 38, p. 2; Tr. Vol. 3, p. 105, Ls. 17-21 (Attiani testimony).

67.   DBSI's credit for taxes was prorated based on Greensboro's nine-month ownership of Signature Pace, Tr., Vol. 2, p. 118, Ls. 22-24 (Sullivan testimony); Exhibit E (Closing Statement); Tr. Vol. 3, p. 105, Ls. 17-21 (Attiani testimony); *see also* Exhibit FFFF; Tr. Vol. 3, pp. 113-14.

68.   It is customary in the real estate industry for prorations of operating expenses to be made after a closing, and for collections of taxes and operating expenses to be distributed to the previous owner based on the length of time of ownership of the real property.  Tr. Vol. 3, p. 28 Ls. 11-25 (Harrison testimony); Tr. Vol. 2, p. 113, L. 3 - p. 114, L. 2 (Sullivan testimony).

69.   Section 8.4 is a clause that is customary in the real estate industry to indicate the obligation to prorate such operating expenses.  *See id*.

70.   Section 8.4 means that "the seller is supposed to be responsible for and obtain the benefits of the property up to the date of Closing, and the purchaser is supposed to be responsible

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 35**

for the obligations and receive the benefits of things that accrue after closing."  Tr. Vol. 3, p. 29, Ls. 4-9.  Thus, if pass-throughs and operating expenses were owing to the seller at Closing and they were ultimately collected by purchaser, they should be paid to the seller.  Tr. Vol. 3, pp. 31-32; *see also* Tr. Vol. 3, p. 28, Ls. 14-22 (Harrison's testimony that he sees proration provisions in all of his real estate sales transactions); Tr. Vol. 3, p. 73, Ls. 11-14 (Dunn testimony).

71.    Dividing operating expenses for 2004 based on the nine-month ownership methodology used for the tax credit at Closing was contemplated by Harrison at the time the contract was drafted, and later by DBSI employees.  *See* Exhibit QQQ (email of DBSI employee Marcie Brock, dated October 4, 2004, stating that "we are to reconcile the full year 2004 expenses.  We then need to remit Jan – Sept recaptured expense to the former owner"); Tr. Vol. 3, p. 93, Ls. 3-11 (explaining that it was not possible for DBSI to do an analysis of the reimbursements until towards the end of the first quarter of the year 2005, after all of the expenses/charges for December came in).

## V.

## CONCLUSIONS OF LAW

After reviewing the evidentiary record, including a detailed study and analysis of the trial transcript, considering the legal authorities submitted and the positions asserted by the respective parties, applying applicable legal principles to interpretation of the language of the Agreement, and considering all of the extrinsic evidence, the Court makes the following Conclusions of Law.[11]

---

[11]  To the extent any Findings of Fact are deemed to be conclusions of law, they are incorporated by reference into these Conclusions of Law.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 36**

**A.    Application of State Law**

1.    The Court's jurisdiction in this action is based on diversity of citizenship.  Under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), "federal courts sitting in diversity jurisdiction apply state substantive law and federal procedure law."  *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996).

2.    North Carolina law applies to the parties' breach of contract claims and Idaho law applies to Plaintiff's fraud and unfair and deceptive acts or practices claims.  *See* Order, p. 12 (Docket No. 110).

**B.    Breach of Contract Claims**

3.    It is a well-settled principal of construction in North Carolina that "[i]t must be presumed that the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean."  *Hagler v. Hagler*, 354 S.E.2d 228, 234 (N.C. 1987) (quoting *Indemnity Co. v. Hood*, 40 S.E.2d 198, 201 (N.C. 1946)).  To ascertain this intent, North Carolina courts look to the language used by the parties in the contract.  *Id*.  Presumably, the words selected by the parties were not placed there by mere coincidence, rather, they "were deliberately chosen and are to be given their ordinary significance."  *Briggs v. Mills*, 111 S.E. 2d 841, 843 (N.C. 1960).

4.    Section 8.4 and Section 9.4(e) of the Contract are ambiguous as a matter of law.  *See* Order, p.19 (Dkt. No. 110); Order, p.13 (Dkt. No. 129).

5.    Where the contract is ambiguous, other relevant and material extrinsic evidence should be considered to ascertain the parties' intent for the contract.  *See Lagies v. Myers*, 542 S.E. 2d 336, 342 (N.C. Ct. App. 2001).  Such extrinsic evidence may include evidence of an

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 37**

industry custom and usage to ascertain the parties' intent.  *See Peaseley v. Virginia Iron, Coal,*

*Coke Co.*, 194 S.E.2d 133, 142 (N.C. 1973).

6.     Because the Contract was prepared by and negotiated between equally capable,

skilled, and sophisticated legal counsel for DBSI and Greensboro, both with extensive

experience in real estate transactions, and because neither party maintained a stronger bargaining

position and there is other reliable evidence showing the parties' intent as to the meaning of the

provisions at issue, the rule of *contra proferentum* is not applicable.  *See* November 28, 2006

Order, pp. 4-8 (Docket No. 129).

7.     Based on the relevant and extrinsic evidence presented at trial and the Findings of

Fact stated above, the intent of the parties at the time of contracting was for the GOC Upfit

Allowance and TRC Upfit Allowance to be assumed by DBSI at Closing as contractual

obligations of DBSI.

8.     Neither TRC nor GOC had equitable liens in Signature Place.  Both TRC and GOC

had adequate remedies at law available to them with respect to recovery of the tenant upfit

allowances.

9.     The conditions for payment of the GOC Upfit Allowance and TRC Upfit Allowance

had not been met as of the Closing Date.

10.     Section 9.4(e) warrants only that no labor had been performed nor materials supplied

to the Seller, Greensboro, for which Greensboro had not paid.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 38**

11.     Courts in North Carolina have not squarely addressed the effect of an "as is" agreement on breach of contract claims involving alleged issues related to real property, even though a number of other jurisdictions have held that a buyer or lessee cannot recover on such claims, particularly where experienced parties engage in arms-length negotiations and the buyer has an opportunity to discover the alleged issue with the property.

12.     The Court will not extend North Carolina law, but the "as is" provision in the Contract, Section 6.3, has been considered along with the Contract as a whole.  This provision limits the warranties made by Greensboro under the Contract and places duties on DBSI to investigate and to view the property.

13.     Greensboro did not breach the Contract.

14.     DBSI breached the Contract by failing to reimburse Greensboro for prorations of 2004 operating expenses collected by DBSI from Signature Place tenants after the Closing Date.

15.     Pursuant to Section 8.4 of the Contract, DBSI is liable to Greensboro for $103,497.92.

**C.     Implied Covenant of Good Faith and Fair Dealing**

16.     "[I]n every contract there exists an implied contract of good faith and fair dealing; and more specifically, under such rule, the law will imply an agreement that neither party will do anything which will destroy or injure the right of the other to receive the benefits of the agreement."  *Maglione v. Aegis Family Health Ctrs.*, 607 S.E.2d 286, 291 (N.C. Ct. App. 2005) "[A] party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement."  *Id.* (quoting *Weyerhaeuser Co. v. Bldg. Supply Co.*, 253 S.E.2d 625, 627 (1979)).

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 39**

17.     Greensboro did not act in bad faith or unfairly in obtaining and delivering the tenant estoppel certificates to DBSI, nor did any of Greensboro's representatives, particularly Sullivan, act to destroy or injure the right of DBSI to receive the benefits of the Contract or otherwise fail to use reasonable efforts to perform Greensboro's obligations under the Contract.

18.     Defendants did not breach the implied covenant of good faith and fair dealing.

**D.     Fraud Claim**

19.     To establish fraud there must be evidence of (1) a representation, (2) its falsity, (3) its materiality, 4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) the hearer's reliance on the truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury.  *Aspiazu*, 139 Idaho at 550, 82 P.3d at 832.

20.     DBSI did not establish that Sullivan made a representation that was false.

21.     DBSI did not establish that it had a right to rely on any representation, if made, considering the contractual warranties and representations and the information available to DBSI through the due diligence process.

22.     Defendants did not commit fraud.

**E.     Consumer Protection Claim**

23.     The Idaho Consumer Protection Act ("ICPA") makes unlawful certain "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . where a person <u>knows or in the exercise of due care should know</u>, that he has in the past, or is [engaging in prohibited conduct]."  Idaho Code § 603 (emphasis added).  The plain

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 40**

language of the ICPA thus requires some degree of knowledge by the party whose conduct is alleged to be false or misleading.  *See also, e.g.*, *In re Wiggins*, 273 B.R. 839, 866 (Bkrtcy. D. Idaho 2001); *In re Edwards*, 233 B.R. 461, 471 (Bkrtcy. D. Idaho 1999).

24.    A requirement of knowledge that rises to the level of at least reckless indifference or an intentional avoidance of the truth is supported by cases interpreting the Federal Trade Commission Act, an act that is accorded "great weight" in interpreting the ICPA.  *See* Idaho Code § 48-604(1); *State ex rel. Kidwell v. Master Distribs., Inc.*, 101 Idaho 447, 453, 615 P.2d 116, 122 (1980); *FTC v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005).

25.    Defendants did not commit any unfair and deceptive acts or practices with the degree of knowledge required by the ICPA or otherwise violate the ICPA.

**F.    Summary**

The outcome of this action has been guided by the Contract language and by the testimony explaining what those who negotiated and/or drafted the Contract intended the terms to mean. Notably absent from the trial was testimony from Mike Thomas, an individual at DBSI who played an integral role in negotiating for the purchase of Signature Place.  In contrast, the principle negotiators for Defendants, Sullivan and Harrison, provided extensive testimony on the Contract terms and their intended meaning.

Considering this and all of the relevant and extrinsic evidence presented at trial that is consistent with the Contract language, this Court finds, and thus concludes, that Greensboro did not breach the Contract and Defendants did not commit fraud or unfair and deceptive acts or practices or breach a duty of good faith and fair dealing.  This Court finds, however, that DBSI breached the Contract and is liable to Greensboro for $103,497.92.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 41**

It is notable that DBSI has obtained judgment in its favor on a claim for prepaid rent in the amount of $2,428.13 and on Greensboro's counterclaim for a leasing commission paid to Alliance Commercial Properties, LLC, in the amount of $122,072.00.  *See* Order, pp. 25-28 (Docket No. 110); Graham Affidavit, Ex. K, p. 52 (Docket No. 80-8). .

## VI.

## RULE 52(c) MOTION

During trial, Defendants made a motion under Federal Rule of Civil Procedure 52(c), *see* Tr. Vol. 2, p. 69, Ls. 12-16; Tr. Vol. 3, pp. 121-27, which provides:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.  Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

The Court has considered the evidence presented by both parties in ruling on their respective claims, has ruled in favor of Defendants on every claim at issue in the court trial and, therefore, declines to enter judgment in Defendants' favor as a matter of law.

## VII.

## ATTORNEYS' FEES CLAIMS

Both parties have requested an award of attorneys' fees.  Second Amended Complaint, p. 10, ¶ 38 (Docket No. 55); Answer to Second Amended Complaint & Counterclaim, pp. 13-14 (Docket No. 90).  The Contract provides: "In the event it becomes necessary for either party

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 42**

hereto to file a suit to enforce this Contract or any provisions contained herein, the party prevailing in such action shall be entitled to recover . . . reasonable attorneys' fees, expenses and costs of court incurred in such suit."  Exhibit 1, p. 18, § 12.9.  Here, although Defendant has prevailed on its counterclaim and on Plaintiff's claim for breach of contract, breach of the covenant of good faith and fair dealing, fraud, and violation of consumer protection laws, Plaintiff obtained summary judgment in its favor on another of Defendants' counterclaims and on its claim for prepaid rent.  Order (Docket No. 110).

The parties also have cited to Idaho statutes in support of their attorneys' fees requests, *see* Second Amended Complaint, p. 10, ¶ 38 (Docket No. 55); Answer to Second Amended Complaint & Counterclaim, p. 14 (Docket No. 90); however, the parties have agreed that Idaho's substantive law applies only to the fraud and consumer protection claims and that North Carolina's law applies to the contract claims.  Accordingly, there are issues of law to be resolved before any attorneys' fees request can be considered.  For this reason, if Defendants wish to pursue an award of attorneys' fees they must file an appropriate motion and supporting brief in accord with Federal Rule of Civil Procedure 54(d) and the corresponding Local Rule, within the time allowed after entry of judgment in this action.  Any supporting brief should address which state's law applies to the attorneys' fees request and should fully support the request for fees with citation to case law, statutes, and applicable rules.

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 43**

# VIII.

# ORDER

Based on the foregoing, IT IS HEREBY ORDERED:

1.      Plaintiff's claims for breach of contract, breach of the implied covenant of good

         faith and fair dealing, fraud, and violation of the Idaho Consumer Protection Act

         are DENIED.

2.      Defendants' counterclaim for breach of contract is GRANTED and Judgment

         awarded in Defendant Greensboro's favor in the amount of $103,497.92.

3.      The Judgment will include an award of the amount owing to Plaintiff based on the

         summary judgment ruling in its favor on (i) its claim for a credit for TRC's

         prepaid rent deposit, and (ii) Greensboro's counterclaim for breach of contract

         requesting recovery for a post-closing payment of a leasing commission to

         Alliance Commercial Properties.  May 9, 2006 Order (Docket No. 110).

         Specifically, Plaintiff is awarded $2,428.13 for TRC's prepaid rent deposit.

4.      In accord with the summary judgment ruling (Docket No. 110), Greensboro's

         counterclaim for breach of contract requesting reimbursement for a leasing

         commission is denied and that claim is dismissed.

5.      Any motion or request for an award of attorneys' fees shall be made within the

         time allowed by the Federal Rules of Civil Procedure and the District of Idaho

         Local Civil Rules and shall be fully supported by appropriate affidavits and a

**MEMORANDUM DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW - 44**

memorandum not to exceed twenty (20) pages that includes citation to case law,

statutes, and the applicable rules.



DATED: **December 3, 2007**.

Honorable Larry M. Boyle
United States District Court